**Ex parte Randall Dale ADAMS, Applicant.**

**No. 70787.**

Court of Criminal Appeals of Texas, En Banc.

March 1, 1989.

Randy Schaffer, Houston, for appellant.

John Vance, Dist. Atty., Leslie McFarlane, Asst. Dist. Atty., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

DUNCAN, Judge.

This is an application for a writ of habeas corpus brought pursuant to Article 11.07, V.A.C.C.P. An extensive hearing was held by the trial court who made findings of facts and conclusions of law.

The applicant was originally convicted in 1977 of the capital murder of Robert Wood, a Dallas police officer, and assessed the death penalty. Based upon the testimony elicited in applicant's trial, the Dallas police officer was shot and killed by the driver of an automobile he and his partner had stopped for failing to have its headlights turned on. The State's main witness was David Harris, who was sixteen years old at the time of the offense.[1] According to Harris, several days prior to the murder he had stolen the car involved in the murder, as well as the murder weapon from a neighbor in Vidor, Texas. After leaving Vidor he soon made his way to Dallas where he picked up the applicant, who was hitchhiking. Harris stated that after he had picked up the applicant they drove around during the day prior to the murder drinking and smoking marihuana. That evening they went to a movie. After leaving the movie, with the applicant driving the stolen automobile, they were stopped by the police. Harris, fearing he would be identified, slumped down in the front seat. According to Harris, as the police officer approached the car the applicant reached under the front seat, where he knew the stolen pistol was located, removed the weapon and shot Officer Wood several times. Then they drove off.

Harris testified that after the murder, he left the applicant at his motel and returned to Vidor the next day. While in Vidor Harris was arrested for the theft of the car

and released to his parent's custody. Afterwards, he bragged to his friends that he had killed a Dallas police officer. Several days later Harris was again arrested after the Vidor police heard of his comments about the Dallas police officer. After again being taken into custody Harris changed his story and told the police that the applicant had shot Officer Wood.

The applicant testified in his own behalf and in summary stated that Harris had left him at his motel after the movie and that he was not with Harris when Officer Wood was killed.

In rebuttal, the State called three witnesses. Emily Miller testified that she and her husband, Robert, drove past the scene of the shooting after the assailant's car had been stopped but before the police officer was shot. She and her husband both specifically identified the applicant as being the only person present in the suspect vehicle. The other rebuttal witness was Michael Randel who stated that he saw two people in the car and specifically identified the applicant as being the driver.

The applicant's conviction and sentence of death was affirmed by this Court. *Adams v. State,* 577 S.W.2d 717 (Tex.Cr. App.1979). The United States Supreme Court, however, reversed the applicant's death sentence when it concluded that § 12.31(b), *Tex.Penal Code* was being unconstitutionally utilized to exclude prospective, qualified jurors in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Upon reacquiring jurisdiction of the case and consistent with the Supreme Court's opinion, this Court granted the applicant a new trial. During the interim, however, at the request of the Dallas District Attorney, then Governor Clements commuted the applicant's death sentence to a life sentence. Thereafter, on the State's Motion for Rehearing, the applicant's conviction and life sentence were affirmed. *Adams v. State,* 624 S.W.2d 568 (Tex.Cr.App.1981).

---

**1.** Section 8.07(d) Tex.Penal Code states:
No person may, in any case, be punished by death for an offense committed while he was younger than 17 years.

In his application for writ of habeas corpus, the applicant presents thirteen grounds to support his request for a new trial. Among those urged by the applicant and pertinent to this opinion are the following paragraphs: Paragraph V claims that the applicant is not guilty of the offense; Paragraph VI asserts that the applicant was denied his right of confrontation under the Sixth and Fourteenth Amendments to the United States Constitution and Art. I, § 10 of the Texas Constitution when he was prevented from cross-examining Harris relative to two burglaries and an aggravated robbery pending against him at the time of the trial; Paragraph VIII argues that his right to due process of law under the Fourteenth Amendment to the United States Constitution and due course of law under Art. I, § 19 of the Texas Constitution was infringed when the State suppressed Officer Wood's partner's initial description of the driver of the suspect automobile; Paragraph X claims that the applicant's right to due process and due course of law was violated when the State knowingly suppressed a prior inconsistent statement made by Emily Miller; Paragraph XI asserts that the applicant's rights to due process and due course of law were violated when the State knowingly suppressed evidence that Emily Miller had failed to identify the applicant in a police lineup and a police officer advised her that she did not identify the applicant and told her which person she should have identified; Paragraph XII, consistent with the preceding contention, claims that the applicant's conviction was obtained in violation of due process and due course of law when Emily Miller committed perjury when she testified outside the presence of the jury that she had identified the applicant in a police lineup; Paragraph XVII, in numerous subparagraphs claims that the applicant was denied effective assistance of counsel in violation of the due process clause of the Fourteenth Amendment and the due course of law provision in Art. I, § 19 of the Texas Constitution.

As previously noted, the trial court has provided us with findings of fact and conclusions of law and therein recommends that the request for habeas corpus relief based on the contentions found in Paragraphs VI, VIII, X, XI, XII of the application for writ of habeas corpus be granted and that Paragraph XVII be conditionally granted and concludes that the applicant should be afforded a new trial. He also recommends that the relief requested in the remaining paragraphs be denied.

In response, the State filed "State's Response to Applicant's Writ of Habeas Corpus" which states as follows:

> Having reviewed the testimony of the evidentary hearing held in the above-styled and numbered cause, the State has no objection to the trial court's finding regarding the testimony of Emily Miller at the original trial and the finding that Applicant is entitled to a new trial.

Because of the State's response, we therefore find it necessary to discuss only those allegations asserted in Paragraphs X, XI and XII of the Application for Writ of Habeas Corpus. Initially, however, we will also review the findings made by the trial court in Paragraph V for reasons that will be apparent later in this opinion.

As previously noted, in Paragraph V the applicant claims that he is entitled to habeas corpus relief and a new trial because "he is innocent of the offense for which he was convicted." During the hearing on the applicant's writ of habeas corpus Harris recanted his trial testimony and attested to the innocence of Adams. Harris stated that he testified against the applicant during the trial because of promises made to him by the prosecutor, Douglas Mulder. Although Mulder disputes this testimony, it is uncontroverted that at the time of the trial Harris had pending against him in Vidor two burglary cases, an aggravated robbery case, and that a motion to revoke his juvenile probation had been prepared. It is further uncontroverted that after the applicant's trial those charges "disappeared." During the writ hearing, the applicant presented testimony from Sam Catrell, Chief of the Orange Police Department. During December, 1977, Catrell was an officer with the Vidor Police Department and arrested Harris on the burglary

offenses and the aggravated robbery offense. He also testified that he acquired written confessions from Harris to those offenses, but those offenses were never actually filed. Catrell testified:

Because of the fact that at the time David [Harris] was a material witness in the offense in Dallas as to whether specifics of an agreement or any agreement, if any, were made, I don't know. It was just our understanding that David would come to Dallas and testify in the trial in Dallas. And there was some type of provisions made for him to go to some—whether it be—not necessarily an institutional setting, but some type of setting remove him from the environment. He in Vidar and possibly provide him some help from the problems he had. [sic et passim]

Chief Catrell also testified that it was his understanding that Harris would not be prosecuted for the burglaries or the aggravated robbery and his probation would not be revoked. Catrell further stated that "with all certainty, he [Harris] was not ..." prosecuted for those offenses. In fact, according to Catrell, "[t]hey weren't filed with the District Attorney...." Consequently, it would have been legally impossible for Harris to have been prosecuted for the offenses if they weren't filed with the District Attorney.

Irrespective of whether a "deal" was struck with Harris in exchange for his testimony against the applicant it is uncontradicted that he was never prosecuted for those charges and actually enlisted in the Army after the applicant's trial.[2]

Based in part on testimony and other evidence, Judge Baraka concluded that "Al-

though the court cannot determine the applicant is 'innocent' of the Wood murder ["Since innocence is not a basis in Texas for a new trial ..."], on the basis of the evidence presented at the habeas corpus hearing, applying the law which places the burden of proof on the State beyond a reasonable doubt, the court would have found applicant not guilty at a bench trial."

Prior to the applicant's trial, it is undisputed that defense counsel filed motions requesting that the State provide to defense counsel written witness' statements after the witness testifies. On January 31, 1977, at a pre-trial hearing, this motion was granted. Further, and again in response to a pre-trial motion, the trial court ordered the State to provide the applicant with any evidence in their file that would be favorable to the applicant or inconsistent with applicant's guilt. This was to be done prior to trial. Immediately prior to the trial, Mulder testified under oath that there was nothing in the State's file that would be considered favorable to the applicant or inconsistent with the State's theory of his guilt.

During applicant's trial, as previously observed, Emily Miller specifically identified the applicant as being at the scene of the murder. During the writ hearing the veracity of her testimony and the validity of her identification of the applicant were rendered respectively perjurious and tenuous. According to Miller's testimony at the writ hearing, on December 3, 1976, approximately a week after Officer Wood was killed and the same day a $20,000 reward was posted and publicized for information leading to the apprehension of Officer

**2.** At the writ hearing Harris testified that the charges pending against him in Vidor were never pursued, and that he never again reported to his probation officer. He also testified that in November, 1977, he enlisted in the Army; while in the Army he was charged with an assault in January, 1978, which was dismissed; that in June, 1978, he committed some burglaries in Germany; in September, 1978, he stole some money and in October, 1978, he was court-martialed and sentenced to Leavenworth Federal Penitentiary for these offenses.

Further, in June, 1979, he was released from Leavenworth only to be arrested five months

later in California for "one kidnapping charge, one armed robbery, one burglary, and attempted burglary [sic], and attempted robbery." He was convicted in February, 1980, of some of those charges and sentenced to 6½ years in a California prison.

According to Harris, he was paroled on this sentence in December, 1984, and returned to Vidor. Nine months later Harris burglarized an apartment in Beaumont, kidnapped a woman, and killed the man attempting to rescue her.

In April, 1986, he was convicted of capital murder and assessed the death penalty.

Wood's killer, she gave a written statement to the Dallas police in which she described the driver of the car at the scene of the murder as having "about a 3 inch afro ... [who was] either a mexican or a very light skinned blackman." The statement further claimed that "[w]e [she and her husband] passed the cars and I did not know about the shooting until the next day." This statement was not heard by the jury in applicant's trial because by the time it was discovered by defense counsel, Miller had already been excused. Although defense counsel requested that she be recalled for cross-examination, the trial court denied this request because the prosecutor told the court that the Millers had left the city and returned to Bellville, Illinois, and that he did not know how to contact them. At the writ hearing the false nature of this information became obvious when Miller testified that after she testified at the trial she and her husband moved to the Alamo Plaza Motel in Dallas and were there on the Monday her written statement to the police was discovered by defense counsel.

Further, in a related, previous Federal writ of habeas corpus hearing, which was made a part of this record, Miller testified that she had advised the prosecutor of where she and her husband were moving after she testified. Mulder disputed this; however, it is undisputed that his file contained Miller's telephone bill from the Alamo Plaza Motel with Mulder's notations thereon.

During the applicant's trial, in a hearing outside the presence of the jury, Miller testified that she had identified the applicant in a lineup. However, during the writ hearing the truth of this matter also became clear. After the applicant was ar-

rested on December 21, 1976, Miller came to the police station and upon observing a lineup specifically identified someone other than the applicant. After the misidentification, either in her husband's presence or not, depending upon which story one elects to believe,[3] Miller was told by the Dallas police officer in charge of the lineup that she had identified the wrong person. He then told her the applicant's number in the lineup. Thus, Miller, contrary to her trial testimony, now admits that she never identified the applicant in a lineup.

Relative to Miller's testimony and in conjunction with the applicant's allegations, the trial court made very specific, extensive findings of facts and conclusions of law that can be summarized as follows: The trial court entered the orders on the pre-trial motions as previously noted, that Mulder testified under oath that there was no information in the State's file that fell within the order of the trial court. That the prosecutor did not tender Miller's statement to defense counsel either before trial or after Miller testified, whereas he had voluntarily done so with statements of other State's witnesses. That substantial and significant discrepancies exist between Miller's testimony at the trial and her written statement. Further, Miller's written statement constituted material that should have been delivered to the defense under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Gaskin v. State*, 172 Tex.Cr.R. 7, 353 S.W.2d 467 (Tex.Cr. App.1962). And, most significantly, "[t]he prosecutor knowingly suppressed Mrs. Miller's written statement."

The trial court further found that after Miller testified and was excused, the State

---

**3.** During the writ hearing, Emily Miller testified she did not recall whether she attended the lineup with her husband, Robert Miller. However, during the Federal writ of habeas corpus hearing, she testified that she and her husband both attended the lineup and that Robert Miller after viewing the lineup did not identify anyone.

Miller, at the writ hearing, also testified that although a police officer told her the number of the "right man" in the lineup she did not remember whether her husband was with her when this occurred. Contrary to this testimony, at the Federal writ of habeas corpus hearing she

testified: "my husband and I were standing outside of the room out of the lineup room or whatever it is there, and my husband or I, one of us, asked which one it was, and they told us the number."

The impact of Miller's testimony is obvious— if her husband was present when she was told the number of the "right man" his identification of the applicant would also be tainted.

At the writ hearing, Robert Miller testified that he did not view a lineup and identified the applicant from a photo spread after applicant's trial had started.

and the defense rested and closed the evidence. That the next trial day the defense, after receiving information that Miller had given a prior inconsistent written statement to the police, again requested the statement. At that point Mulder gave the defense Miller's inconsistent written statement. Applicant then requested the trial court to allow him to reopen the evidence whereupon Mulder advised the trial court that Miller had already left Dallas for Bellville, Illinois, and that he had gone to her apartment that morning and discovered she had moved. Responding to such assurances, the defense then sought to have the statement admitted into evidence as impeachment. Mulder objected to this as being unfair because Miller would not have a chance to explain the differences between the two statements. The trial court excluded the statement from evidence, "observing that if Mrs. Miller was still in Dallas, the court 'absolutely' would allow applicant to recall her."

In its findings, the trial court concluded that despite Mulder's assurances to the court to the contrary, while this was occurring Miller was still in Dallas at the Alamo Plaza Motel. That after she completed her testimony she told Mulder that she would be at the Alamo Plaza Motel if he needed her any further. And, significantly, "Mr. Mulder's statement to the court that Mrs. Miller was en route to Bellville, Illinois, was incorrect." Further, the presence of Miller's motel telephone bill in the State's file, along with Mulder's notations on it, was corroborative of the State's knowledge of Miller's whereabouts.

The trial court concluded this portion of his findings of fact and conclusions of law by observing that the suppression of Miller's statement was harmful to the applicant because it could have been used to impeach her testimony identifying him as the driver. According to the trial court, the suppression of Miller's statement "undermines the court's confidence in the jury verdict" and recommends that habeas corpus relief be granted.

Relative to Miller's identification testimony, the trial court concluded as follows: at the applicant's trial, outside the presence of the jury, she testified she had identified the applicant at a lineup, that in response to the trial judge's questions she testified that no one had suggested who she should identify and that she identified the applicant on her own, and that based upon this testimony the trial court found that her trial identification had not been tainted by an unduly suggestive lineup. Judge Baraka concluded that her trial testimony was false and by her own admissions she never identified the applicant at a lineup and was advised by the officer conducting the lineup as to the number in the lineup of the applicant and that he was the "right" man.

Further, "[t]he State, through the Dallas Police Department, knew that Mrs. Miller not only failed to identify applicant in the lineup, but actually identified someone else." And, because "officers of the Dallas Police Department, an agency of the State, knew that Mrs. Miller did not identify applicant in a police lineup, the State knowingly used perjured testimony at trial in eliciting her testimony that she had identified applicant in a police lineup."

The trial court found that such conduct violated the applicant's right to due process and denied him a fair trial and accordingly recommended that habeas corpus relief be granted.

■ The procedure set forth in Article 11.07, V.A.C.C.P., is the exclusive State felony post-conviction judicial remedy available in Texas. *Ex parte Brown*, 662 S.W. 2d 3 (Tex.Cr.App.1983). The purpose of the writ of habeas corpus is simple—it is a process utilized to determine the lawfulness of confinement. *Ex parte McGowen*, 645 S.W.2d 286 (Tex.Cr.App.1983). However, it is clear that habeas corpus is available to review only jurisdictional defects, or a denial of one's fundamental or constitutional rights. *Ex parte Russell*, 738 S.W. 2d 644 (Tex.Cr.App.1986). In addition, in seeking habeas corpus relief the applicant assumes the burden of proving his factual allegations, *Ex parte Adams*, 707 S.W.2d 646 (Tex.Cr.App.1986); *Ex parte Salinas*, 660 S.W.2d 97 (Tex.Cr.App.1983), by a pre-

ponderance of the evidence, *Ex parte Griffin,* 679 S.W.2d 15 (Tex.Cr.App.1984).

■ It is a fundamental principle of our habeas corpus law and regularly stated that under the procedure authorized by Article 11.07, if the trial court convenes a hearing, elicits testimony and thereby develops facts, the Court of Criminal Appeals is not bound by the trial court's findings and conclusions of law. *Ex parte Adams,* supra. Accordingly, this Court is obligated to determine if the record developed supports the trial judge's findings. *Ex parte Young,* 479 S.W.2d 45 (Tex.Cr.App.1972). If the record will not support the trial judge's conclusions, then this Court may make contrary findings. *Ex parte Davila,* 530 S.W.2d 543 (Tex.Cr.App.1975); *Ex parte Bagley,* 509 S.W.2d 332 (Tex.Cr.App. 1974); *Ex parte Williams,* 486 S.W.2d 566 (Tex.Cr.App.1972). If, on the other hand, the findings of the trial judge are supported by the record, they should, at the very least, be considered by this Court. *Id.*

In *Ex parte Turner,* 545 S.W.2d 470 (Tex.Cr.App.1977), this Court went beyond the vague and indefinable parameters that invariably accompany the conclusion that the trial judge's findings should be considered if supported by the record and stated: "[t]hough this Court has the ultimate power to decide matters of fact in habeas corpus proceedings, generally if the trial court's findings of fact are supported by the record, they should be accepted by this Court." *Id.,* at 473.

The Court's observation in *Ex parte Turner, id.,* echoes the Court's comments in *Ex parte Moore,* 136 Tex.Cr.R. 427, 126 S.W.2d 27 (1939). In *Moore,* the Court compared a trial judge's factual findings in a habeas corpus proceeding to a jury's resolution of factual disputes. The Court stated:

Where the ruling of the trial judge depends upon the existence or non-existence of a certain fact and testimony pro and con is introduced thereon and the evidence is conflicting it becomes the duty of the trial judge to determine the issue, and unless it appears to this court that his finding was without support in

the evidence, and that he had committed an error in his judgment thereon, we would not interfere with his findings thereon.

*Id.,* 126 S.W.2d at 28.

In the present case, after reviewing the record and noting the "State's Response to Applicant's Writ of Habeas Corpus," we find that the trial judge's findings of fact relative to Miller's testimony are amply supported by the record and are adopted by this Court.

The origin of a prosecutor's duty to disclose information to a defendant can be traced to the United States Supreme Court's decision in *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). In *Mooney,* the Court first established the general proposition that a prosecutor's knowing and intentional use of perjured testimony in obtaining a conviction violates the defendant's due process rights and denies him a fair trial. The *Mooney* principle was expanded in *Alcorta v. Texas,* 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957), to forbid the prosecutor's passive use of perjurious testimony. The Court held that the prosecutor's knowing failure to correct inculpatory, perjured testimony also violated due process. In *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the Court expanded the *Mooney* principle even further and held that the prosecutor's knowing failure to correct perjured testimony, even if it relates solely to the credibility of the witness, constitutes a violation of due process.

In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court diverted its focus from the conduct of the prosecutor and instead directed it to the fairness of the proceedings to the defendant. The Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to the punishment, irrespective of the good faith or bad faith of the prosecution." *Id.,* at 87, 83 S.Ct. at 1196.

For over two decades both the Supreme Court and State appellate courts have at-

tempted to resolve the ambiguities of the *Brady* decision. In *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed. 2d 104 (1972), the Supreme Court decided that evidence of a promise of leniency to a witness made by another prosecutor should have been disclosed to the defense even if the prosecutor trying the case acted in good faith and did not know of the offer because a "promise made by one attorney must be attributed to the Government." *Id.*, at 154, 92 S.Ct. at 766. Accordingly, the Court concluded that the government's failure to disclose the impeachment evidence was a violation of due process. In addition, the Court articulated a standard for materiality, left unexplained in *Brady*, by stating that "if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury,'" *id.*, then it was sufficiently material to require a new trial.

In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Court established several different standards of materiality. First, in cases where the prosecution knew or should have known that perjured testimony was utilized to secure a conviction then materiality would be present and a new trial ordered "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.*, at 103, 96 S.Ct. at 2397. The Court believed that such a standard was appropriate because such cases "involve a corruption of the truth-seeking function of the trial process." *Id.*, at 104, 96 S.Ct. at 2397.

Second, the Court observed that if the defense makes a specific pretrial request for exculpatory evidence and the prosecutor is thereby placed on notice his "failure to make any response is seldom, if ever, excusable." Although the Court did not expressly identify a standard of materiality it is obvious that it intended to apply the "may have affected the trial outcome" standard.

Third, in those cases in which the defendant makes either no request or an overly general request, although the prosecutor will still have a duty to disclose favorable

evidence, the standard of materiality will necessarily be higher than in the preceding situations. The Court stated:

> If the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt whether or not the additional evidence is considered, there is no justification for a new trial.

*Id.*, at 112–113, 96 S.Ct. at 2402.

In 1985 the Supreme Court again confronted the issue of the prosecutor's failure to disclose to the defendant favorable evidence. In *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), a divided Court replaced the *Brady–Agurs* multiple materiality standards and adopted a single materiality standard. In doing so, the Court rejected the distinctions between specific requests for exculpatory evidence and no requests for such evidence. In *Bagley* the defendant was indicted for violating Federal narcotics and firearm statutes. Prior to trial the defendant filed a discovery motion requesting that the trial court order the government to disclose " 'any deals, promises or inducements made to witnesses in exchange for their testimony.'" *Id.*, 105 S.Ct. at 3377. The government's response to the defendant's discovery motion did not disclose any " 'deals, promises or inducements.'" *Id.* Several years after the defendant was convicted, he discovered that the government's only witnesses had executed contracts to provide to the Bureau of Alcohol, Tobacco and Firearms information concerning his activities, collect evidence against him and testify against him in court. The witnesses were to be paid an amount of money "upon the accomplishment of the objective...." *Id.*, 105 S.Ct. at 3378.

The Supreme Court noted initially that the rule of *Brady v. Maryland*, supra, was based on the requirement of due process, and its overriding purpose was to insure that a defendant receives a fair trial by requiring the prosecution to disclose favorable evidence. The Court further noted

that unlike *Brady* and *Agurs* the case involved impeachment evidence but it too was subject to the *Brady* dictates and should not be distinguished from any other exculpatory evidence.

The Court thereafter reviewed its holding in *Agurs* and the standards of materiality it established. The Court also noted that since *Agurs,* the Court had decided *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which held:

> [t]hat a new trial must be granted when evidence is not introduced because of the incompetence of counsel only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.,* at 693, 104 S.Ct., at 2068. The *Strickland* Court defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* [Footnote omitted]

The Court then dispensed with the *Agurs* standards of materiality that distinguished between "no request," "general request," and "specific request" cases and concluded that the standard identified in *Strickland v. Washington,* supra, would be "sufficiently flexible to cover all of the preceding situations." *Id.*

■ Significantly, however, the majority opinion did not disturb the standard of materiality announced in *Agurs* for cases involving the prosecution's knowing utilization of perjurious testimony.

In *Ex parte Turner,* supra, this Court adopted the *Agurs* test for materiality in both specific request and no request cases. Implicitly, the Court adopted the *Agurs* standard of materiality when perjured testimony is utilized.

In *Hernandez v. State,* 726 S.W.2d 53 (Tex.Cr.App.1986), we adopted the *Strickland v. Washington,* supra, standard to resolve claims of ineffective assistance of counsel. We are now equally persuaded by the reasoning of the Supreme Court in *Bagley* when it adopted the *Strickland* standard for materiality in cases involving exculpatory evidence. Since the *Bagley* Court did not disturb the standard of materiality established in *Agurs* when dealing with the prosecution's knowing use of perjured testimony we hereby expressly adopt that standard also.

Comparing these standards to the trial court's findings it is obvious that habeas corpus relief is necessary. The statement Miller gave to the police on December 3, 1976, which the trial court found the State intentionally failed to disclose, contains statements that are the diametric opposite of Miller's trial testimony. During the writ hearing the applicant's attorney introduced, without objection, an exhibit that details the abundant discrepancies between the two statements.[4] Obviously, this is the type of prior inconsistent statement (Rule 612, *Tex.R.Crim.Evid.*) that could have had the effect of substantially soiling Miller's direct identification testimony. In *Napue v. Illinois,* supra, the Supreme Court observed that the State's principal identification witness had, contrary to his trial testimony, been offered something in exchange for his testimony. In finding that the prosecutor had a duty to correct the perjured testimony the Court commented, "The jury's estimate of the truthfulness and reli-

4.

| TRIAL TESTIMONY (4–29–77) | WRITTEN STATEMENT (12–3–76) |
|---|---|
| Told Robert to slow down so I could see who was in the car stopped by the police | No mention |
| I recognized Officer Wood because he had taken my daughter home before | No mention. Refers only to "one officer" walking up to the car. |
| Identifies Adams, a white man, as the driver | driver was "either a mexican or a very light skinned black man" |
| Identifies Adams, who had a large moustache | no mention of moustache |
| Heard a noise and told Robert, "Well, that policeman probably got shot." | "We passed the cars and I did not know about the shooting until the next day." |
| Returned to scene later and saw police and ambulance | No mention of returning |
| Identifies Adams as driver | no mention she could identify driver |

ability of a given witness may well be determinative of guilt or innocence." *Id.* Had Miller's statement been provided to the defense, as the trial court had ordered, it would have obviously constituted a secure basis for impeachment and could have nullified the effect of her otherwise unimpeached identification of the applicant.

■ The probable adverse effect disclosure of the statement to the defense would have had upon the State's case is evident by the lengths the State went to see that it was not admitted into evidence. Judge Baraka found in essence that the trial court had been deceived by the State into believing that Miller had left Dallas and therefore denied the appellant's attorney's request to reopen. Trial courts must be able to rely upon the veracity of its officers. When deceit produces court rulings that have the effect of denying one a fair trial then the conviction should be vacated.

■ The question now is whether the evidence was "material in the sense that its suppression undermines confidence in the outcome of the trial." *United States v. Bagley,* supra, 105 S.Ct. at 3381. Applying the standard of materiality endorsed by the Supreme Court in *Bagley,* we conclude that the State's suppression of Miller's prior inconsistent statement was material in the sense that had it been "disclosed to the defense, the result of the proceeding would have been different." *Id.,* 105 S.Ct. at 3384.

■ The issue of Miller's perjurious testimony regarding her identification of the applicant involves both the suppression of evidence favorable to the accused and the State's knowing use of false testimony. During the applicant's trial, after the three rebuttal witnesses had testified and Miller had identified the applicant, the State closed. The applicant's attorney then belatedly requested a hearing outside the presence of the jury in order to determine whether Miller's identification testimony had been tainted by an improper photo spread or lineup. The trial judge observed that the request was untimely because Miller had already identified the applicant. Nevertheless, he permitted the hearing to allow the applicant to perfect a bill of exception. It was during this hearing that Miller perjured herself by testifying falsely that she had identified the applicant in a lineup and that no one had influenced her in her identification. After the hearing the trial judge commented that he considered the issue of a tainted identification to have been waived by the defense, but emphasized that the defense had the right to go into it in front of the jury. In this regard it must be remembered that at this time the applicant had no knowledge of the truth about the identification or the prior inconsistent statement.

Following his comments to counsel, the judge concluded, that Miller's identification testimony "was not influenced either by the witness having seen photographs of the defendant or by the witness having viewed the defendant in a lineup of people conducted by law enforcement authorities." He further stated: "The Court finds there is no taint, that the identification of the witnesses in court is based solely on the witnesses having viewed the defendant at the time and place where the offense was committed as alleged in the indictment." He also comments that irrespective of his factual findings a waiver of a defect in the identification had occurred.

■ Mulder testified that he did not know Miller had identified someone other than the appellant in the lineup, nor did he know that the officer in charge of the lineup told her who she should have identified. However, this is insufficient to remove the taint of the prosecution's knowing use of perjured testimony. As previously noted, the United States Supreme Court has expressly recognized that when confronted with perjurious testimony the prosecutor has a duty to correct it. *Giglio v. United States,* supra; *Alcorta v. Texas,* supra. Further, whether the prosecutor had actual knowledge of the falsity of the testimony is irrelevant. If the prosecutor should have known is sufficient. *Giglio v. United States,* supra. Thus, the Supreme Court has endorsed the imputation of knowledge, at least from one prosecutor to another. *Id.* However, the extent of this

imputation of knowledge has been expanded. In *Williams v. Griswald*, 743 F.2d 1533 (CA11 1984), the court of appeals stated: "It is of no consequence that the facts pointed to may support only knowledge of the police because such knowledge will be imputed to state prosecutors." *Id.*, at 1542. In *United States v. Antone*, 603 F.2d 566 (CA5 1979), the court of appeals observed that it has "declined to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both investigative and prosecutorial personnel." *Id.*, at 569.

The Dallas police officer that "helped" Miller was by her own admission in charge of the lineup. Consequently, as a part of the investigating team his knowledge of Miller's lack of identification at the lineup and his assistance to her is imputed to Mulder. *United States v. Antone*, supra. Consequently, when Miller testified that she had identified the applicant in a lineup Mulder had an obligation to correct the perjured testimony. *Giglio v. United States*, supra.

 As previously discussed, the standard one must utilize in evaluating the materiality of the false evidence was first stated in *Napue v. Illinois*, supra, and repeated in *Giglio v. United States*, supra, as follows: "A new trial is required if 'the false testimony could ... in any reasonable likelihood have affected the judgment of the jury.'" *Giglio v. United States*, supra, 405 U.S. at 154, 92 S.Ct. at 766. In *United States v. Bagley*, supra, the Supreme Court observed that this materiality standard having been derived from *Napue v. Illinois*, supra, obviously preceded the harmless error rule announced in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In creating the harmless error rule in *Chapman*, the Court stated:

> [t]here is little, if any, difference between a rule formulated, as in *Napue*, in terms of 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction,' and a rule 'requiring the benefi-

ciary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'

*United States v. Bagley*, supra, 105 S.Ct. at 3382, fn. 9.

It is obvious that the Supreme Court was equating the two standards. In *Mallory v. State*, 752 S.W.2d 566 (Tex.Cr.App.1988), we acknowledged that Rule 81(b)(2), *Tex.R. App.Pro.* was basically a codification of the harmless error rule of *Chapman v. California*, supra. Therefore, for the sake of simplicity, in the case of perjured testimony we will apply the harmless error analysis required by Rule 81(b)(2).

In the present case, had Miller testified truthfully, or more appropriately, had Mulder corrected her perjurious testimony, it would be sheer speculation to try and determine what the judge would have done inasmuch as the identification testimony had already been admitted. However, in *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the Supreme Court held it is a violation of due process under the Fourteenth Amendment to permit an identification that is the result of an unnecessarily suggestive lineup. In *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), the Supreme Court reversed the defendant's conviction when it was shown that "[t]he suggestive elements in the identification procedure made it all but inevitable that David [the eyewitness] would identify petitioner whether or not he was in fact 'the man.'" *Id.* at 443, 89 S.Ct. at 1129. The Court continued, "In effect, the police repeatedly said to the witness, 'This is the man.'" *Id.* This, according to the Court, "undermined the reliability of the eyewitness identification as to violate due process." *Id.*

In this case the police didn't "[i]n effect ... [say] *[t]his* is the man." *Id.* Rather, the police said *this is* the man, after the witness had identified someone else. The impropriety and resulting taint on the identification is obviously greater in this case than in *Foster*. Consequently, it is quite possible that the trial court, reflecting on the Supreme Court's comment that "[a]

conviction which rests on a mistaken identification is a gross miscarriage of justice," *Stovall v. Denno,* supra, 388 U.S. at 297, 87 S.Ct. at 1970, could have, despite the waiver, stricken Miller's identification of the applicant. If that had transpired then the prosecution would have lost a witness that placed the applicant at the scene of the murder.[5] There is, accordingly, a "reasonable likelihood ...," *Giglio v. United States, id.,* that the absence of such testimony would have "affected the judgment of the jury." *Id.* Or, in other words, we cannot say beyond a reasonable doubt that the perjured testimony did not contribute to the applicant's conviction or punishment. Rule 81(b)(2).

On the other hand, even if one were not to engage in such speculation, there is no question that the misidentification and the improper coaching of Miller by the police would constitute exculpatory evidence that was favorable to the defense and should have been disclosed. If this evidence had been given to the defense it is doubtful whether Miller would have been allowed to testify at all.[6] Consequently, the State would have still lost their chief identification witness. The only difference between the two errors is the standard of materiality. Under the alternative standard of materiality set out in *Bagley* we again have no difficulty concluding that had the evidence been "disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* supra, 105 S.Ct. at 3384.

■ These conclusions are corroborated and thus supported by the trial court's determination that had the case been tried to the court he would have found the applicant not guilty. It must be emphasized that it has historically been the rule that the sufficiency of evidence cannot be attacked collaterally through a post-conviction writ of habeas corpus. *Ex parte Easter,* 615 S.W.2d 719 (Tex.Cr.App.1981) *cert. den.,* 454 U.S. 943, 102 S.Ct. 481, 70 L.Ed. 2d 252 (1982); *Ex parte Rogers,* 83 Tex.Cr.

R. 152, 201 S.W. 1157 (1919). Nevertheless, the trial court's conclusion justifies our determination that the applicant is entitled to a new trial.

It is the fundamental, constitutional purpose of this Court to insure that a convicted defendant received a fair trial. Any system of government that incorporates within its guarantees ordered liberty necessarily recognizes and appreciates the necessity of providing a process to litigate and resolve allegations of criminal conduct. In order to comply with the dictates of the Fourteenth Amendment of the Constitution, the ultimate aim of the process must be fundamental fairness. To be sure, it is not necessarily the character of the prosecutor that dictates the fairness of a trial. Rather, it is the character of the evidence that we must be concerned with. However, in the area of suppression of exculpatory evidence and the knowing use of perjured testimony a prosecutor's discretion will be necessarily involved in our analysis. In the present case, the trial court found the State was guilty of suppressing evidence favorable to the accused, deceiving the trial court during applicant's trial, and knowingly using perjured testimony. In each instance, the nature of the evidence or testimony was such that beneficial results inured to the State at the expense of due process.

The constitutional principles requiring disclosure of evidence favorable to an accused and the prohibition on knowingly using false evidence to convict are basic to the due process of law mandated by the Fourteenth Amendment. Such rights are equally applicable to the due course of law rights identified in Art. I, § 19 of the Texas Constitution. Accordingly, the decision of this Court in enforcing these rights "is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." *Brady v. Maryland,* supra, 373 U.S. at 87, 83 S.Ct. at 1196.

---

5. See fn. 3.

6. It is questionable whether Robert Miller would have been allowed to testify if Emily

Miller's testimony at the Federal writ hearing is to be believed. See fn. 3.

In *Ex parte Bush,* 166 Tex.Cr.R. 259, 313 S.W.2d 287 (1958), we stated: "This Court has the power and authority to prevent the enforcement of a judgment [of conviction] obtained under circumstances which constitute a denial of due process." *Id.,* 313 S.W.2d at 288. Thus, consistent with the findings of the trial court, the applicant's request for relief in Paragraphs X, XI, and XII are granted. All other relief requested is denied.

Accordingly, applicant's conviction is set aside and he is ordered released to the custody of the Sheriff of Dallas County to answer the indictment in Cause No. F–77–1286.