### Ex parte Johnny Frank GARRETT.

### No. 14992–02.

Court of Criminal Appeals of Texas, En Banc.

Nov. 20, 1991.

Selden B. Hale, III, Amarillo, Eden B. Harrington, Robert L. McGlasson, Austin,

Scott W. Howe, Springfield, Mass., for appellant.

Danny Hill, Dist. Atty., and James Farren, Asst. Dist. Atty., Amarillo, Robert Huttash, State's Atty., Austin, for the State.

▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬

CLINTON, Judge, dissenting.

This is a post-conviction application for writ of habeas corpus brought pursuant to Article 11.07, V.A.C.C.P. In 1982 applicant was convicted of the offense of capital murder and his punishment assessed at death. This Court affirmed his conviction in 1984. *Garrett v. State,* 682 S.W.2d 301 (Tex.Cr.App.1984). Applicant was seventeen years old when he committed this offense.

Applicant contends, *inter alia,* that his sentence of death violates the Eighth Amendment in that the jury at the punishment phase of trial was provided no mechanism for effectuating evidence having mitigating value either not relevant to or having relevance beyond the scope of the special issues contained in Article 37.071(b), V.A.C.C.P. In its proposed conclusions of law the habeas court would hold that applicant has forfeited this claim for failure to raise it at the trial level. However, in *Black v. State,* 816 S.W.2d 350 (Tex.Cr. App.1991), a majority of this Court held that such a claim can be raised for the first time on appeal or on collateral attack, at least so long as the trial occurred prior to the date of decision in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).[1] In my view youth alone is a mitigating factor having significance beyond the pale of the special issues. *Ex parte Earvin,* 816 S.W.2d 379 (Tex.Cr.App. 1991) (Clinton, J., dissenting). Because ap-

---

1. Odd, then, that in its order today the majority reviews the record and "finds" that the conclusions of the trial court "are supported by the record." Neither the convicting court nor, now, the majority addresses the merits of applicant's *Penry* claim. Yet it is clear under *Black* and

*Selvage v. Collins,* 816 S.W.2d 390 (Tex.Cr.App. 1991) (Opinion on Certified Question from the United States Court of Appeals for the Fifth Circuit), that such a claim is not procedurally barred.

plicant was sentenced by a jury given no means to prescribe, should it so choose, a sentence less than death based on that factor, his death sentence violates the Eighth Amendment. *Gribble v. State,* 808 S.W.2d 65, at 75 (Tex.Cr.App.1990). Applicant is entitled to a new trial. Because the Court does not grant that relief, I respectfully dissent.

Applicant also complains that what is now former Article 37.071 operated effectively to preclude other evidence in mitigation that could have been, but was not presented at the punishment phase of his trial. Because evidence he now proffers as to his history of family violence and drug and alcohol abuse, and of his limited intelligence and possible brain damage could only, under Article 37.071, have operated to his detriment, he was prevented as a practical matter from producing that evidence at trial. Alternatively he contends that his trial counsel was ineffective for failing to investigate and adduce that evidence.

Applicant's trial attorneys arranged to have applicant examined prior to trial by a psychologist, Dr. Thomas Milton Cannon, Jr. Dr. Cannon performed a number of tests, including an I.Q. test, and concluded applicant had a low average intelligence. He also concluded applicant would represent a future danger to society. Cannon had not been made aware of any history of child abuse, and was not privy to applicant's records from the Texas Youth Council. One of applicant's trial attorneys testified that a "tactical" decision was made not to utilize Dr. Cannon at trial because his testimony would only have been detrimental to applicant because "as applied to the issues, those issues in the jury charge, ... it would be more helpful to the State than it would be to Mr. Garrett." Significantly, applicant's other trial attorney testified at the writ hearing as follows:

"Q. It would be fair to say you weren't going to use [Dr. Cannon's testimony] because it was going to hurt the Defendant more than it was going to help him if the jury heard about it?

A. That's correct. Yes, that's correct, yes.

Q. If, in fact, there was not—and I realize it's been seven years, but if, in fact, there was not any information you received from Dr. Cannon that would have been mitigating, then it really wouldn't have helped if the law had been different, allowing for mitigating evidence, would it?

I mean, if you don't have any to present, it doesn't help that that law allows that, does it?

A. [Counsel], I don't really know—I don't know that we ever really thought of it in that light. *What we were looking at is just on that one issue, you know, and it never dawned on me until the Franklin case came down, you know, that all of us who tried those capital cases should have been looking further than the three issues that were presented.*" [2]

I take this to mean that before the United States Supreme Court opinion in *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), applicant's trial counsel did not make "tactical" decisions that encompassed consideration of any mitigating evidence having relevance apart from or beyond the scope of Article 37.071 special issues. Counsel was simply unaware or unmindful of the Eighth Amendment principles that eventually led to the Supreme Court's holding in *Penry.* A failure to investigate under these circumstances surely amounts to ineffective assistance of counsel. *Ex parte Herrera,* 819 S.W.2d 528 (Tex.Cr.App., delivered May 29, 1991) (Clinton, J., dissenting).

Applicant's half-sister appeared at the writ hearing. She testified that applicant's mother had married five times, that his natural father had "disowned" him, and that applicant had suffered at the hands of a succession of stepfathers. One, the witness's natural father, would beat applicant with his fist and "rub[ ] his nose in the mess" when applicant soiled the bed. Another stepfather "put ... cigarettes out on [applicant's] behind." Yet another one sexually abused applicant. At the instigation

---

**2.** All emphasis supplied.

of the witness's father, applicant began drinking at the age of eleven or twelve. He drank frequently and also smoked marihuana. He told his half-sister he had also used "[c]rystal, LSD, acid, angel dust, speed." Once when drinking applicant had an iron gate fall down on him, striking him between the eyes, breaking his nose, and causing him to go into convulsions. Applicant believed there was a ghost in the house, and held conversations with his grandmother and aunt, both dead.[3]

3. In its proposed findings of fact the habeas court "did find evidence of familial turmoil and abuse of the Applicant[.]"

4. Dr. Lewis's affidavit was attached to the application for writ of habeas corpus, and was introduced at the writ hearing as part of the basis for Dr. Dickerson's expert opinion. Following a recitation of her credentials, Dr. Lewis states:

"At the outset, it should be noted that Johnny Garrett is one of the most psychiatrically impaired inmates among the many that I have interviewed over the past twelve years. The evaluation of Johnny Garrett that I conducted revealed the following:

Johnny Garrett is chronically psychotic and has suffered a multiplicity of psychotic symptoms from childhood until the time of my evaluation. In fact, the prison records I reviewed indicated that prison doctors had diagnosed him as suffering from schizophrenia. He has long suffered from visual and auditory hallucinations. Indeed, during my interviews with Mr. Garrett, it soon became clear that he was, at times, hallucinating. When asked with whom he was communicating, he indicated that this was with an aunt who had died just after he had entered prison. He reported having first begun hearing voices and seeing things that were not there when he was in the fourth grade. He also exhibited a variety of peculiar beliefs and paranoid delusions and a strong history of paranoia that were indicative of psychosis. As a result of his psychosis, Johnny Garrett misperceives reality, often thinks he is being threatened, and may lash out, in what he perceives to be selfdefensive action, in violent and inappropriate ways.

It should also be noted that Mr. Garrett has a history of severe head injuries dating from early childhood. The most serious may have been when he fell from the roof of his house when he was approximately 10 years of age. There is a palpable scar in the right occipital region from this fall. He also suffered a serious motorcycle accident at approximately age 15, which may account for another scar in the left occipital region. Johnny Garrett also has a scar on the left frontal region where he was reportedly hit in the head with a large rock in childhood.

Preparatory to the writ hearing applicant was examined by another psychologist, Dr. Windel Dickerson. Dr. Dickerson conducted an extensive review of applicant's family history and "the entire treatment record of his Texas Youth Council stay." He also reviewed the findings of a psychiatrist and professor from the New York University Medical Center, Dr. Dorothy Otnow Lewis, who had examined applicant pursuant to a study,[4] and the results of neurological testing conducted by Dr. Ellis Richardson. On

Perhaps as a result of these central nervous system injuries, Johnny Garrett is also seriously brain-damaged. He has long suffered from a multiplicity of symptoms consistent with central nervous system dysfunction, and a seizure disorder. In fact, he has a history of having experienced grand mal seizures, during which he has shaken, fallen, and has had incontinence of urine. He has also had episodes of behaviors, reported to him by others, for which his memory is impaired or entirely absent. These, and other symptoms (e.g. olfactory hallucinations) suggested to the neurologist the possibility that Mr. Garrett also suffers from complex partial seizures.

Mr. Garrett's performance on numerous neuropsychological tests confirmed his significant brain damage. For example, on the Halstead–Reitan battery of tests, Mr. Garrett required 27 minutes to complete the Tactile Performance section. Completion time over 15 minutes is indicative of brain injury or significant central nervous system dysfunction. Moreover, on the Categories section, a test of the ability to conceptualize abstractly, Mr. Garrett made 91 errors. A score of more that [sic] 50 errors is indicative of brain damage or brain dysfunction. As stated, this brain damage was confirmed in the independent conclusions of a neurologist who evaluated Mr. Garrett.

Johnny Garrett also has a history of having witnessed and been the victim of extreme physical and sexual abuse. Mr. Garrett reportedly witnessed events in which his biological father was extremely brutal to his mother and his brother. Although Mr. Garrett reports that his father never abused him, several of his stepfathers were extremely physically and sexually abusive to Mr. Garrett. The reports of physical abuse are substantiated by the many scars on Mr. Garrett's body. For example he has numerous scars on his back where one of his stepfathers reportedly beat him. He also reported to me having been placed on a hot stove when he was a young boy because he would not stop crying. In order to verify this assertion, I requested that Dr. Pincus, the neurologist, examine Mr. Garrett's buttocks. Dr. Pincus verified the pres-

the basis of all this data Dr. Dickerson concluded that applicant suffered from schizophrenia, "probably paranoid schizophrenia;" and "chronic brain syndrome[,]" which he described as "complications arising by behavior and thought and a lot of other things arising out of some kind of brain damage." He concluded that applicant "is one of the most profoundly and pervasively disabled people I've encountered in the last 25, 28 years of practice." Dickerson's own written evaluation of applicant suggests that applicant's condition could have been diagnosed as of the time of trial.[5]

Considering the nature of the mitigating evidence adduced at the writ hearing, and which would have been ascertainable at the time of trial, I believe there is a "reasonable probability"—that is to say, "a probability sufficient to undermine confidence in the outcome"—that the jury might have found in its reasoned moral judgment that

applicant deserved a sentence of less than death. *Strickland v. Washington*, 466 U.S. 668, at 694, 104 S.Ct. 2052, at 2068, 80 L.Ed.2d 674, at 698 (1984). Even had counsel made a conscious and informed decision not to adduce this evidence, such a "Hobson's choice" amounts to no more than "a court-induced 'tactical' decision to avoid helping the State satisfy its burden of proof." *Ex parte Herrera*, supra, at 532 (Clinton, J., dissenting). As it is, counsel was not even cognizant of the choice he made by failing to investigate and adduce the evidence. Either way the proper course is to vacate the sentence of death and remand the cause for a new trial. *Id.*

Finally, in his written report of his examination of applicant Dr. Dickerson noted:

"Mr. Garrett does appear to be aware of the proceedings against him and is aware that the State is seeking to execute him. Paired with this under-

---

ence of scars on his buttocks consistent with the history of having been seated on the burner of a stove. Thus, I believe Mr. Garrett has been honest in his reports of abuse.

Mr. Garrett also reported having been the victim of extreme sexual abuse at the hands of his family, especially his third stepfather, a Mr. Whiteside, and that man's friends. These events with the stepfather reportedly occurred around 1977. Mr. Garrett reported having been forced to perform acts of fellatio and having to submit to frequent acts of anal intercourse. He also reported that Mr. Whiteside and acquaintances of Mr. Whiteside (a man named "Kent" and another man named "Darryl") forced him to engage in sex with adult men while being filmed. He reportedly was also forced to engage in a sexual act with a dog. Mr. Garrett reported that in the course of making these pornographic films, he saw children as young as 7 years old being filmed having sex with adults. These kinds of extreme sexual abuse most probably contributed to the bizarre nature of his offense.

It is my professional opinion that Johnny Garrett's well-documented and apparently longstanding brain damage, his psychosis, coupled with his long history of having suffered brutal child abuse, severely impaired his ability to act deliberately and to control his conduct at or about the time of the event in question. The influence of drugs and/or alcohol would have further impaired his functioning. These vulnerabilities would also have impaired Johnny Garrett's ability to make mature judgments, reflect in advance upon the appropriateness of his conduct, un-

derstand the consequences of his behavior, or even have full awareness of his actions.

It is my opinion that the psychosis and neuropsychiatric deficits described would certainly have been relevant to issues of responsibility and/or mitigation during Johnny Garrett's trial. Further, the clinical data of these disorders that is documented in this affidavit could have been documented prior to Johnny Garrett's trial in 1982 in the course of a competent clinical evaluation."

5. Dr. Dickerson concludes:

"All available sources concur that Mr. Garrett is a severely impaired individual. Emotional development was arrested at a very early age. Paranoid ideation, delusional thought and misinterpretation arising from neurological limitations would contribute significantly to a tendency to misread events and react out of his emotionally needy status. He appears experience [sic] almost total alienation from all social and familial institutions and is impaired in thought, feeling and association to some degree in every significant sphere. It is relatively rare to see such pervasive and encompassing psychopathology. It is likely that many, if not most of these parameters could have been observed as he entered school. Certainly, some of them were or he would not have been placed in special classes. Most of these parameters are reflected either directly or indirectly in TYC records (which generally try to avoid pejorative labeling in the civil rights interest of the child) and could have been readily captured by competent examination at the time of the offense."

standing is the probably psychotic belief that his dead aunt will protect him from the effects of the sedative and toxic agents used."

At the habeas hearing Dickerson was asked:

"Q. ... Do you still agree with that statement today?

A. If Mr. Garrett is still experiencing that delusion, yes; and still very much as he was when I saw him, yeah.

Q. Is the schizophrenic problem and delusions that Mr. Garrett suffers from the kind of thing, in your professional opinion, that continues over time?

A. Yes, it generally does."

Now applicant contends he cannot be executed consonant with the Eighth Amendment because he "does not presently understand that the state has the ability to extinguish his life through lethal injection." See *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). The Court should at least file and set this application to address this question.

In *Ford* the Supreme Court held it violates the Eighth Amendment to execute the insane. The full Court did not announce a standard, however, for determining "insanity" for Eighth Amendment purposes. In a separate opinion Justice Powell suggested such a standard. He opined:

"*[M]ost men and women value the opportunity to prepare, mentally and spiritually, for their death.* Moreover, today as at common law, one of the death penalty's critical justifications, its retributive force, depends on the defendant's awareness of the penalty's existence and purpose. * * *

... If the defendant perceives the connection between his crime and his punishment, the retributive goal of the criminal law is satisfied. *And only if the defendant is aware that his death is approaching can he prepare himself for his passing.* Accordingly, I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it."

477 U.S. at 421, 422, 106 S.Ct. at 2607, 2608, 91 L.Ed.2d at 354. While a majority of the Supreme Court has not yet adopted this standard, we have found it to be a "persuasive" one. *Ex parte Jordan,* 758 S.W.2d 250, at 254, & n. 7 (Tex.Cr.App. 1988). It seems to me a more than plausible argument can be made that if applicant truly believes his dead aunt will intervene to save him from the effects of an otherwise lethal injection, he is not likely to appreciate "that his death is approaching" so that he can "prepare himself for his passing." This Court is the ultimate factfinder in post-conviction habeas corpus proceedings; the habeas court's findings are advisory only. *Ex parte Adams,* 768 S.W.2d 281, at 288 (Tex.Cr.App.1989). Moreover, outside of the context of post-conviction habeas corpus under Article 11.-07, there is no other established procedure for making determinations of competency *vel non* to be executed in Texas. *Ex parte Jordan,* supra. The upshot is that applicant has not had a final determination in the state forum as to whether his execution would violate the Eighth Amendment under *Ford.* Once again the Court abjures passing on a substantial question that is properly before it, apparently preferring to leave it for the federal courts to resolve on federal habeas corpus. See *Ex parte Earvin,* supra (Clinton, J., dissenting).

For all the foregoing reasons, I respectfully dissent.

MALONEY, J., joins.

BAIRD, Judge, dissenting.

I respectfully dissent to the majority's refusal to file and set this cause for submission on applicant's *Penry* claim. See, *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

## I.

The extensive hearing testimony regarding applicant's severe childhood abuse, his schizophrenia and his chronic brain syndrome are well chronicled in Judge Clinton's dissenting opinion, and need not be repeated herein. This mitigating evidence

is virtually indistinguishable from the mitigating evidence presented in *Penry*.

In *Penry*, the Supreme Court held that this type of mitigating evidence fell beyond the scope of the special issues contained in the former Tex.Code Crim.Proc.Ann. art. 37.071. With respect to the first special issue on deliberateness, the Court held "[i]n the absence of jury instructions defining 'deliberately' in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability, we cannot be sure that the jury was able to give effect to the mitigating evidence of Penry's mental retardation and history of abuse in answering the first special issue. Without such a special instruction, a juror who believed that Penry's retardation and background diminished his moral culpability and made imposition of the death penalty unwarranted would be unable to give effect to that conclusion if the juror also believed that Penry committed the crime 'deliberately.'" *Penry*, 492 U.S. at 323, 109 S.Ct. at 2949.

In analyzing the second special issue on future dangerousness, the Supreme Court noted that Penry's mental deficiencies were relevant to the issue, but further recognized that such evidence was relevant only as an aggravating factor and not as a mitigating factor. Characterizing such evidence as a "two-edged sword"—diminishing his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future, the Court concluded that the second special issue did not provide a vehicle for the jury to give mitigating effect to Penry's evidence of mental retardation and childhood abuse. *Id.*, 492 U.S. at 323, 109 S.Ct. at 2949.

The Supreme Court also held that the third special issue, regarding provocation, failed to provide a manner in which a sentencer could express a determination that Penry lacked the moral culpability to be sentenced to death. *Id.*, 492 U.S. at 324, 109 S.Ct. at 2950. The Court noted that in order to ensure reliability that a sentence of death is appropriate punishment, the sentencer must be able to consider and give effect to any mitigating evidence relevant to a defendant's background, character, or circumstances of the crime. *Id.*, 492 U.S. at 328, 109 S.Ct. at 2952. The Court concluded that in Penry's case, "in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty, we conclude that the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision." *Id.*

The reasoning employed in *Penry* is equally applicable in the case at bar, for the mitigating evidence in both cases are substantively similar. Simply put, the three special issues of former Tex.Code Crim.Proc.Ann. art. 37.071 failed to provide the jury with a device with which to give mitigating effect to applicant's mitigating evidence.

## II.

Counsel's failure to introduce mitigating evidence at trial should not now bar this Court from considering the mitigating evidence developed in his post-conviction application for writ of habeas corpus. This Court should expressly disavow any allusion to the contrary. *Goodman v. State*, 816 S.W.2d 383, 387 (Tex.Cr.App.1991) (Baird, Overstreet and Maloney, JJ., disavowing the "dicta" in footnote six which suggests that this Court will not consider mitigating evidence presented for the first time in an application for writ of habeas corpus). *See also Young v. State*, 826 S.W.2d 141, 144 n. 5, (Tex.Cr.App.1991) (This Court generally regards footnotes as dicta).

Indeed, a majority of this Court has excused counsel's failure to make *Penry* type objections at trial in cases tried before the *Penry* decision pursuant to the doctrine of novelty. *Black v. State*, 816 S.W.2d 350 (Tex.Cr.App.1991). If, in pre-*Penry* cases, counsel is excused from making a *Penry* objection, it is an anomaly to require counsel to have presented *Penry* type evidence at trial, either by way of a proffer or as

evidence before the jury. Simply put, these twin conclusions are inconsistent.

If a majority of this Court persists in the conclusion that counsel had to present *Penry* evidence at trial even though such evidence could not have been given effect under the statute, then the majority must also conclude that counsel was ineffective for failing to do so. This is the conclusion reached by Judge Clinton in his dissenting opinion to this cause. At 305.

Either under the merits of applicant's *Penry* claim, as I would urge, or under applicant's claim of ineffective assistance, as Judge Clinton urges, this Court should review the merits of applicant's *Penry* claim, as adduced at the post-conviction hearing. Because the majority refuses to do so, I respectfully dissent.