**Ex Parte Max MOUSSAZADEH, Applicant.**

**No. 74,185.**

Court of Criminal Appeals of Texas.

Dec. 19, 2001.

Rehearing Denied Feb. 6, 2002.

---

**406**

Randy Schaffer, Houston, for Appellant.

Baldwin Chin, Asst. DA, Houston, Matthew Paul, State's Atty., Austin, for State.

## OPINION

COCHRAN, J., delivered the Court's opinion, joined by KELLER, P.J., and MEYERS, WOMACK, KEASLER, and HERVEY, JJ.

Applicant in this habeas corpus proceeding contends that his counsel's erroneous advice regarding parole eligibility[1] rendered applicant's guilty plea involuntary. Applicant first argues that his plea agreement with the State implicitly incorporated a (mistaken) understanding of his parole eligibility. He further argues that, even if the plea agreement did not implicitly incorporate this mistaken understanding of his parole eligibility, his plea was still involuntary because his counsel's misadvice induced the plea. Because applicant has not proven, by a preponderance of the evidence, that parole eligibility constituted an affirmative element of the plea agreement, we deny relief on the first issue. We deny relief on applicant's second ground because we rejected this argument in *Ex parte Evans*,[2] and we decline to overrule that precedent.

### I.

Applicant was arrested in December, 1993 and charged with capital murder for the September 12, 1993 robbery-murder of Dairy Barn proprietor, David Orlando. The State theorized that four youths (Justin Dudik, Jason Dill, Brian Collier, and applicant[3]) decided to rob Orlando as he

---

1. Specifically, counsel's misstatement of an inmate's eligibility for parole under a capital murder conviction versus a non-capital murder conviction.

2. 690 S.W.2d 274 (Tex.Crim.App.1985).

3. A juvenile court certified applicant, who was sixteen years old at the time of the offense, to stand trial as an adult.

left his store for the night. Dudik drove the group's car; Dill remained in the car and did nothing. Applicant left the car and served as "look-out" while Collier shot and killed Orlando.

Applicant and Dudik were scheduled to stand trial in December, 1994. On November 14, 1994, the prosecutor offered a plea bargain on the record, which applicant rejected. The trial judge admonished applicant:

> Court: If you were a juvenile when this act occurred, and if you did it, the maximum punishment in your case, if you're found guilty by a jury, is life in the penitentiary. Now you have the right to a trial by jury, you understand that?
>
> Applicant: Yes, sir.
>
> Court: I'm not trying to tell you that you have to accept a plea I'm just telling you what the law is.
>
> Before I make any further statements do either of the lawyers have anything to say about any conversations you've had with your lawyer and the family of the complaining witness?

The prosecutor then stated:

> The State wanted to make sure that the Defendant understood that the State has offered him a plea bargain. The State offered [applicant] that if he would testify in the trial against the co-defendant that we would reduce this from capital murder to murder and allow him to plea to the Court without an agreed recommendation, which substantially reduces his exposure that he would have to serve in the penitentiary before parole.
>
> We just wanted to make sure that he understood that and he's decided that he does not want to accept the offer.

Defense counsel responded:

> I've counseled with Mr. Moussazadeh. I have relayed [the prosecutor's] offer to him and I have counseled with him extensively about that agreement or that recommendation and he has decided, without going into the advice I gave him, but he has decided to reject the State's offer and insist on having a trial.
>
> Court: Is that correct Mr. Moussazadeh?
>
> Applicant: Yes sir.
>
> Court: Did you understand everything I said earlier just a few minutes ago?
>
> Applicant: Yes sir.
>
> Court: Did you understand what ... the representative of the State said?
>
> Applicant: Yes sir.

After informing applicant that his capital murder trial was set and that the State would withdraw its plea offer, the trial judge told applicant:

> Court: This is not a game anyone can play for you to go back and you talk to your inmates and get all the good advice you can get from those guys. The best advice you can get is from your lawyer here.
>
> All right. Just so the record is clear after [the prosecutor] made that last statement do you still wish to refuse that offer to plea for murder, plain murder, not capital murder, murder, and did you say without an agreed recommendation?
>
> Prosecutor: Yes, sir. He may plea to the Court and the Court can sentence him to anything that he wants to.
>
> Court: This would be from 5 years to 99 years or life and a possible fine up to $10,000.00, anywhere in between. I can give you 6 years, 5, 6, 10, 20, 40, 60, 90, give you life and a $10,000.00 fine, anywhere within that range of punishment.
>
> What is your answer?

Applicant: I don't want to take the deal.

Two days later, applicant changed his mind. His attorney explained:

> While [the prosecutor] is looking over [the plea papers] I believe as the record will reflect two days ago you admonished Mr. Moussazadeh concerning his rights. It was Mr. Moussazadeh's position at that point to reject the State's offer. He called me that evening and, again, without violating the spirit of the attorney/client privilege, I learned from actually his mother that he had had a change of heart and wished to enter a plea. I have counseled with him for an hour or more today, explained his options and his consequences. [The prosecutor] as well has questioned Mr. Moussazadeh limited to the issue of cooperation. I am certainly convinced that it is Mr Moussazadeh's intent and desire to enter a plea of guilty pursuant to plea bargain agreement and I would ask that we proceed on the plea.

The prosecutor confirmed that, in return for applicant's truthful testimony at Dudik's aggravated robbery trial, the State would reduce the capital murder indictment to murder and applicant would plead without a recommendation regarding punishment. The prosecutor further warned that "the State [would] argue for the maximum range of life."

The trial court and prosecutor continued on the record with the plea colloquy and all appropriate warnings and waivers. The word "parole" was never mentioned by anyone. The trial judge reiterated that the range of punishment ran from 5 to 99 years or life, and that no agreement existed regarding punishment. The prosecutor interjected: "Your Honor, the Defendant should very clearly understand that the State is not bound by any limits whatsoev-er. The State may argue for the full range of punishment in this case."

After accepting applicant's guilty plea, the trial judge stated:

Court: The Court finds that you used a deadly weapon in the offense of this case. That's the agreement?

Counsel: No.

Prosecutor: That's what he has plead to, Your Honor. The Court may regard that as a punishment issue.

Counsel: That's correct.

Prosecutor: When you make the determination as to what the punishment is.

Counsel: And we reserve that and we ask that you reserve that until after the testimony in the Dudik trial.

Court: I have to go under the law, I have to withhold until then.

As promised, applicant testified at his co-defendant Dudik's trial. He described the facts of the robbery-murder and denied that he had ever held the gun or knew that Collier was going to shoot Mr. Orlando. On direct examination, the prosecutor asked if applicant had any "deal" with the State in exchange for his testimony. Applicant stated:

> The only deal I have is that my charges were reduced from capital murder to murder with me to come into this courtroom and tell the truth on what happened and let the judge sentence me any where from 5 to 99 to life.

Applicant agreed that he was "throwing" himself on the mercy of the judge. During cross-examination, Dudik's counsel asked applicant:

Counsel: And you understood that at the time of the plea bargain when the State reduced the charged from capital murder to murder that there was a big difference in the amount of time

before which you would be eligible for parole between capital murder and murder did you not?

Applicant: Yes I did know that.

Counsel: It was explained to you by State and [your attorney] that if you pled guilty to capital murder as a juvenile you couldn't get the death penalty. You knew that did you not?

Applicant: That's correct.

Counsel: But you could have been forced to stay in prison for 35 years before you were eligible for parole isn't that correct? [4]

Applicant: Yes, sir.

Counsel: Whereas pleading guilty to murder a lesser offense they told you that even if you got life you'd be eligible for parole after 15 years instead of 35 is that right? [5]

Applicant: That's correct.

Counsel: Sixteen years or more you'd be eligible for parole?

Applicant: Yes, sir.

. . .

Counsel: In exchange for your testimony the State reduced the charges from capital murder to murder which could save you, at least could save you 20 years or more in the penitentiary is that correct?

Applicant: That's correct.

On February 13, 1995, the trial judge sentenced applicant to 75 years, but did not enter a deadly weapon finding. There is no sentencing transcript in the habeas record.

It is quite possible that no one in this proceeding knew that the parole law had changed dramatically just 11 days before this robbery-murder. Applicant's parole eligibility is measured by the law in effect on the date of the offense. Under the law effective *until* September 1, 1993, a person serving a life sentence for capital murder was not eligible for parole until serving a flat 35 years. Tex.Code Crim. Proc. Art. 42.18, § 8(b)(2). *After* September 1, 1993, that person was not eligible for parole until serving a flat 40 years. Tex.Code Crim. Proc. Art. 42.18, § 8(b)(2) (effective Sept. 1, 1993). Under the law effective *until* September 1, 1993, a person whose conviction included a deadly weapon finding was not eligible for parole until he had served a flat one-fourth of his sentence, up to a maximum of 15 years. Tex. Code Crim. Proc. Art. 42.18, § 8(b)(3). *After* September 1, 1993, a person whose conviction contained a deadly weapon finding was required to serve a flat one-half of the sentence up to a maximum of 30 years. Tex.Code Crim. Proc. Art. 42.18, § 8(b)(3) (effective Sept. 1, 1993). Under the law effective *until* September 1, 1993, a person convicted of murder (but whose conviction did not contain a deadly weapon finding) was eligible for parole when his good time plus flat time equaled one-quarter of the sentence up to 15 years. Tex.Code Crim. Proc. Art. 42.18, § 8(b)(3). *After* September 1, 1993, a person convicted of murder was not eligible for parole until he had served one-half of his sentence or 30 years. Tex.Code Crim. Proc. Art. 42.18, § 8(b)(3) (effective Sept. 1, 1993).

---

**4.** Dudik's counsel posed his question using the former parole law, not the version in effect at the time of the offense. Had applicant been convicted of capital murder, he would not be eligible for parole until he served 40 years.

**5.** Dudik's counsel again relied upon the former statute in his question. If the trial judge sentenced applicant to life (or any term of 60 or more years), applicant would not be eligible for parole until he had served 30 years.

■ The affidavits submitted by both applicant and his trial counsel with his habeas application state that they did not know of these statutory changes. Indeed, we may fairly infer from the record that the judge, prosecutor, and Dudik's counsel shared the same misunderstanding. However, neither trial counsel's nor applicant's affidavits state that the prosecutor agreed to make applicant's parole eligibility a term or essential element of the plea agreement. There is no evidence that the prosecutor ever discussed any specific term or particular percentage of the sentence that he believed applicant should or would serve in return for the prosecutor's dropping the charges from capital murder to straight murder. In sum, we are unable to find any evidence that proves the prosecutor or judge caused applicant to plead guilty based upon an incorrect understanding of Texas parole law.[6]

## II.

■ This Court has repeatedly held that before a habeas applicant may prevail on a claim that erroneous advice of counsel concerning parole eligibility rendered his guilty plea involuntary, he must prove that parole eligibility was an affirmative part or essential element of the plea bargain. *Ex parte Trahan*, 781 S.W.2d 291, 293 (Tex. Crim.App.1989); *Ex parte Hairston*, 766 S.W.2d 790, 792 (Tex.Crim.App.1989); *Ex parte Stephenson*, 722 S.W.2d 426, 428 (Tex.Crim.App.1987); *Ex parte Pruitt*, 689 S.W.2d 905, 906 (Tex.Crim.App.1985). Applicant bears this burden because of the speculative nature of parole attainment. *Ex parte Evans*, 690 S.W.2d at 279. It is a burden he must prove by a preponderance of the evidence on a writ of habeas corpus. *Ex parte Thomas*, 906 S.W.2d 22, 24 (Tex. Crim.App.1995); *Ex parte Griffin*, 679 S.W.2d 15, 17 (Tex.Crim.App.1984).

The seminal statement of the rule is set out in *Evans:*

> If appellant's understanding of his parole eligibility is manifested as an affirmative part of the plea bargain and that understanding is relied on as an essential part of the quid pro quo for pleading guilty, then appellant's plea is involuntary if that part of the plea bargain is not or cannot be carried out.

690 S.W.2d at 279.

In almost all of the habeas cases in which this Court granted relief, parole eligibility was an *express* and *explicit* part of the plea agreement.[7] In only one case,

---

6. We note that the habeas court entered various findings of fact and conclusions of law to support relief in this case. We defer to the habeas judge's findings of specific historical facts, although we cannot agree with her legal conclusions that applicant's plea was "involuntary" or that applicant's attorney's "incorrect advice and applicant's incorrect understanding regarding parole eligibility was incorporated in the plea agreement." The record does not support these conclusions. *See Ex parte Adams*, 768 S.W.2d 281, 288 (Tex.Crim.App.1989) ("[i]f the record will not support the trial judge's conclusions, then this Court may make contrary findings"); *Evans*, 690 S.W.2d at 276 n. 2 (noting that this Court is not bound by the recommendations of the trial court).

7. *See, e.g., Trahan*, 781 S.W.2d at 291 (written plea memorandum reflected that applicant would become eligible for parole consideration after having served one-fourth of sentence; habeas relief available when that was not the law and terms of plea agreement were impossible to fulfill); *Hairston*, 766 S.W.2d at 791 (when prosecutor was source of erroneous information concerning parole eligibility and that mistaken belief formed basis of plea agreement, applicant entitled to habeas relief); *compare Pruitt*, 689 S.W.2d at 905–906 (when there was no evidence at habeas hearing to support finding of actual agreement between prosecutor and applicant or his counsel concerning parole eligibility, habeas relief unavailable); *Evans*, 690 S.W.2d at 279 (when there was no evidence that parole eligibility formed essential part of plea agreement,

*Stephenson,* 722 S.W.2d at 429, did we conclude that habeas relief was available when the facts showed only "an implied agreement" between the State and defendant concerning parole eligibility.

■ In *Stephenson,* the district attorney admitted at the habeas hearing that he, as well as the defendant and defense counsel, was mistaken about the applicable parole law. *Id.* at 427. He stated that what he sought was a "40 year" sentence, but that he had been willing to waive a deadly weapon finding so that the defendant would be eligible for parole without being required to serve 1/3 of the sentence "flat time." In short, "he believed he had found a way to get 40 years and put the applicant in the position 'that he had agreed to on his guilty plea.'" *Id.* Thus, in *Stephenson,* the mutual misunderstanding about parole law and its essential part of the plea agreement was implicit when the defendant actually made the plea, but became explicit when the prosecutor testified to its terms at the habeas hearing. *Stephenson* stands for the proposition that, when the record clearly shows that a mistaken understanding of parole eligibility formed an essential element of the plea agreement, and that misunderstanding makes the agreement impossible to fulfill, the plea is involuntary. Parole eligibility must be an essential element of the plea

agreement, though it need not be formally incorporated into the record at the time the plea is consummated. Therefore, unless the prosecutor testifies or otherwise acknowledges that parole eligibility was indeed an essential term of the plea agreement to both parties, it is most unlikely that an "implicit" plea bargain term can later be incorporated into the plea agreement.

■ We apply general contract law principles to determine the content of a plea agreement in a criminal case [8]. Generally, courts look only to the written contract (or plea hearing) to discern the contracting parties' obligations. *See Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 728 (Tex. 1981); *Danciger Oil & Ref. Co. v. Powell,* 137 Tex. 484, 154 S.W.2d 632, 635 (1941). Courts look beyond the written agreement or record and imply a covenant or term only when necessary "to effectuate the intention of the parties as disclosed by the contract as a whole." *Danciger,* 154 S.W.2d at 635. An implied covenant or term is sufficiently necessary to the parties' intentions only if the obligation "was so clearly within the contemplation of the parties that they deemed it unnecessary to express...." *Id.* We will not imply a parole eligibility element or covenant unless it appears from the plea agreement's express terms that both parties clearly con-

---

applicant's plea was not involuntary even though his attorney gave him erroneous advice concerning parole eligibility); *Ex parte Hughling,* 706 S.W.2d 662, 663 (Tex.Crim. App.1986) (when review of plea hearing record "shows that neither the prosecutor nor the trial judge made any references or promises concerning applicant's parole eligibility," this was not an element of the plea agreement).

8. *See, e.g., Windom v. State,* 968 S.W.2d 360, 362 (Tex.Crim.App.1998) (citing precedent likening a plea bargain agreement to a contract); *State v. Williams,* 938 S.W.2d 456, 460

(Tex.Crim.App.1997) (stating that "plea bargains are contractual in nature, and specific performance may be mandated if the prosecutor breaks the agreement"; relying upon civil precedent and Restatement of Contracts in discussing contract terms that are unenforceable on public policy grounds); *Ortiz v. State,* 933 S.W.2d 102, 104 (Tex.Crim.App.1996) (stating that "[a] plea agreement is a contractual arrangement"); *Ex parte Adkins,* 767 S.W.2d 809, 811 (Tex.Crim.App.1989) (noting that "plea agreements should be followed the same as a contract under similar circumstances").

templated this element or covenant. *HECI Exploration Company et al. v. Russell H. Neel, Sr.,* 982 S.W.2d 881, 888 (1998).[9] We hold that any finding that parole eligibility formed an essential part of a plea agreement must be founded upon the express terms of the written plea agreement itself, the formal record at the plea hearing, or the written or testimonial evidence submitted by *both* the prosecution and applicant in a habeas proceeding.

### III.

■ Applicant argues that the record sections quoted above in Part I, plus his and his trial counsel's affidavits, prove that "the matter of parole eligibility was implicitly incorporated in applicant's plea agreement." This Court, however, cannot divine any "parole eligibility" agreement—either implicit or explicit—from this record.

Applicant argues that his incorrect understanding of parole eligibility was incorporated into the plea agreement because: 1) during the initial, rejected plea hearing, the prosecutor stated that his part of the agreement—reduction of the charge from capital murder to murder without any agreed recommendation of years—would "substantially reduce[] his exposure that he would have to serve in the penitentiary before parole"; 2) when the trial judge

made a deadly weapon finding during the plea colloquy, trial counsel objected, and the prosecutor agreed that the deadly weapon finding was a punishment issue which should be reserved until sentencing; and 3) neither the trial judge nor the prosecutor corrected applicant's testimony in the co-defendant's trial that, by pleading guilty to murder, applicant would become eligible for parole in, at most 15 years, instead of 35 years had he been convicted of capital murder.[10]

Regarding the first contention, the prosecutor's statement (that reducing the charges from capital murder to murder "would substantially reduce [applicant's] exposure that he would have to serve in the penitentiary before parole") is ambiguous at best. It is, strictly speaking, true. Reducing the charges would definitely reduce the time applicant must serve before he would be eligible for parole. What, however, did the prosecutor's use of the word "substantially" mean? Under the parole law as it *actually* existed, reducing the charges meant applicant would be eligible for parole after serving 30 years on a life sentence for murder, as opposed to 40 years for capital murder. Is not a ten year decrease in prison time "substantial"? Of course, if the trial judge had sentenced applicant to the term of 10–20 years, as his counsel hoped, applicant would have been eligible for parole in 5–10 years—a very

---

9. A court cannot imply an element of a plea bargain to achieve what it believes to be a fair plea agreement or to remedy an unwise or improvident plea. As the Texas Supreme Court has reasoned in the context of civil contracts:

> It is not enough to say that an implied covenant is necessary in order to make the contract fair, or that without such a covenant it would be improvident or unwise, or that the contract would operate unjustly. It must arise from the presumed intention of the parties as gathered from the instrument as a whole.

*Danciger,* 154 S.W.2d at 635.

10. Because there is no evidence that either the trial judge or prosecutor were themselves aware of the change in the parole law, it is not surprising that they did not correct the misstatement contained in the cross-examination questions by Dudik's counsel, to which applicant merely agreed. Applicant's own trial counsel's affidavit states: "To the best of my knowledge, neither the court, the prosecutor, nor I were aware at the time of Moussazadeh's plea that a murder conviction required him to serve aggravated time of ½ of the sentence."

"substantial" reduction. The prosecutor's words do not, by themselves, signal a clear intention to make applicant's misunderstanding of parole law an essential element of the plea agreement.

The same is true of applicant's second suggested indicium of an implicit agreement—the deferral of a deadly weapon finding until sentencing. Applicant argues that from this deferral one should conclude that the prosecutor intended that no deadly weapon finding should be made at all, and thus, there must have been a plea agreement that included a parole eligibility term. These are too many inferences stacked upon each other to support a finding that it was the parties' clear intention that parole eligibility was an essential element of the plea bargain.

Finally, the fact that neither the prosecutor nor the trial judge corrected applicant's agreement with Dudik's attorney, who incorrectly recited the applicable parole law in his questions to applicant, simply demonstrates that either no one was paying close attention or that the trial judge, prosecutor, and Dudik's attorney all shared a common misunderstanding of the applicable parole law. This exchange does *not* prove that the prosecutor and applicant formed any agreement concerning parole eligibility as an essential term of their plea agreement. In sum, we are unable to conclude from the evidence presented that parole eligibility played any part, implicit or explicit, in the plea agreement made between the prosecution and applicant.

In light of the foregoing, we are constrained to deny applicant relief because he has failed to prove, by a preponderance of the evidence, that his plea was induced by a misunderstanding of the applicable parole law which formed an essential element of the plea agreement.

### IV.

■ Applicant's second contention is that his plea should be declared involuntary because it was induced by counsel's misadvice regarding parole eligibility, even if parole eligibility formed no part of the actual plea agreement that was made.

Under Texas law, a guilty plea is not rendered involuntary simply because the defendant received and relied upon erroneous advice of counsel concerning his parole eligibility. *See Ex parte Stephenson,* 722 S.W.2d 426, 427–28 (Tex.Crim.App.1987); *Ex parte Evans,* 690 S.W.2d 274, 277–79 (Tex.Crim.App.1985). Both parole eligibility and parole attainment are highly speculative future facts. *Evans,* 690 S.W.2d at 278. The Legislature frequently amends parole law (either generally or concerning certain crimes) and will likely continue to do so. Moreover, entities such as the Parole Board possess great discretion to approve or disapprove parole in a given case, while TDCJ may grant or withhold "good time" and draft internal rules and regulations which affect both parole eligibility and attainment. Although one can determine current parole *eligibility* with some degree of certainty, it is really parole *attainment* that is significant to a plea bargaining defendant. It matters very little that a person is eligible for parole in one year on a ten year sentence if virtually no one is being paroled in less than seven or eight years on a ten year sentence. It is for this reason that we have termed parole attainment "too speculative to warrant being given effect upon" a defendant's guilty plea. *Evans,* 690 S.W.2d at 279.[11]

---

11. As Judge Miller explained in his concurring opinion in *Ex parte Carillo,* 687 S.W.2d 320, 325 (Tex.Crim.App.1985):

> Parole is very much a speculative proposition. Its happening is contingent on many factors unknown and nonexistent at

Applicant explicitly requests that this Court overrule *Evans* "to the extent that it requires that counsel's misadvice regarding parole eligibility be incorporated in the plea agreement." He relies upon much of the same federal precedent that this Court cited (but essentially rejected) in footnote four of the *Evans* opinion, 690 S.W.2d at 278, n. 4, but asserts no flaw in our reasoning nor facts that distinguish his case. We therefore respectfully decline to overrule or modify this Court's opinion in *Evans*.

We must deny relief.

PRICE & JOHNSON, JJ., concurred in the judgment.

HOLCOMB, J., not participating.

the time of a guilty plea. Factors such as the conduct of appellant in prison, the composition and attitude of the parole board, the population of the prison system, the identity and attitude of the governor, the regulations governing "good time," etc., all are yet to be when the defendant decides to plead guilty. The erroneous advise [sic] from counsel about the time frame of parole eligibility is then about an event, parole, whose time of occurrence, if any, cannot even be accurately guessed at.

Any correlation between parole eligibility and parole attainment has diminished even further in the 16 years since *Ex parte Carillo*.