WR-82,828-01
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 10/12/2015 11:32:54 AM
Accepted 10/12/2015 2:26:35 PM
ABEL ACOSTA
CLERK

**NO. 82.828-01**

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE TEXAS COURT** |
| | § | **OF CRIMINAL APPEALS** |
| **vs.** | § | |
| | § | [Cause No. 09-07-07255 in the |
| **RODNEY ANDERSON** | § | 359th Judicial District Court |
| | § | Montgomery County, Texas] |

RECEIVED
COURT OF CRIMINAL APPEALS
10/12/2015
ABEL ACOSTA, CLERK

## PRELIMINARY PROTECTIVE OBJECTIONS TO TRIAL COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

**TO THE HONORABLE COURT OF CRIMINAL APPEALS:**

NOW COMES Rodney Young Anderson, Applicant, in the above styled and numbered cause, through his attorneys of record, Cynthia E. Orr and Christopher M. Griffith, and hereby respectfully submits his Objections to the Trial Court's Findings of Fact and Conclusions of Law, under Article 11.07, of the Code of Criminal Procedure:

Applicant recites each point in the trial Court's Findings of Fact and Conclusions of Law in italics and objects to each in regular font as indicated below each point to which objection is made.[1]

### FINDINGS OF FACT

*A. Introduction.*

*1. "The applicant, Rodney Young Anderson, was charged in a two-count indictment with committing on February 11, 2008, the offenses of*

---

[1] Applicant's counsel does not currently possess a copy of the transcript of the evidentiary hearing ordered by this Honorable Court. Undersigned counsel intends to amend these objections with record citations upon obtaining the transcript of these proceedings.

1

*possession of methamphetamine with intent to deliver and aggravated assault of a public servant.”*

2.  *“Upon the applicant's plea of "not guilty," a jury found him guilty as charged; and on November 18, 2009, this Court assessed his punishment at imprisonment for forty years for the offense of possession of methamphetamine, and imprisonment for life for the offense of aggravated assault.”*

3.  *“The Court of Appeals for the Ninth District of Texas affirmed the judgment of conviction on December 21, 2011. See Anderson v. State, No. 09-10-00061-CR, 2011 WL 6743297 (Tex. App.-Beaumont Dec. 21, 2011) (mem. op., not designated for publication).”*

4.  *“The Court of Criminal Appeals granted the applicant’s petition for review, and affirmed the lower courts’ judgments on November 27, 2013. See Anderson v. State, 416 S.W.3d 884 (Tex. Crim. App. 2013).”*

5.  *“On November 4, 2014, the applicant filed his first application for a writ of habeas corpus challenging these convictions, setting out approximately five grounds for relief.”*

6.  *“On December 31, 2014, this Court signed findings of fact and conclusions of law, and recommended to the Court of Criminal Appeals that habeas corpus relief be denied.”*

7.  *“On January 23, 2015, the applicant filed an amended application for a writ of habeas corpus, raising several new claims regarding the State’s alleged failure to disclose exculpatory evidence.”*

8.  *“On February 2, 2015, the case was forwarded to the clerk of the Court of Criminal Appeals, in keeping with this Court’s order of December 31, 2014.”*

9.  *On March 25, 2015, the Court of Criminal Appeals issued an order remanded this case to this Court for resolution of the applicant’s claims that ‘the State withheld favorable evidence from the defense.’”*

10. *“The Court of Criminal Appeals further directed this Court to make*

2

*findings of fact and conclusions of law on three specific issues regarding the applicant's claims that the State failed to disclose exculpatory information:"*

> *The trial court shall make findings of fact and conclusions of law as to whether the State withheld material evidence of Anderson's innocence by failing to disclose that eyewitnesses had given statements at the scene in which they were unable to identify the armed men rushing Applicant as law enforcement officers, tending to show that Applicant and his co-defendant were not aware these men were law enforcement. The trial court shall also make findings of fact and conclusions of law as to whether the State failed to disclose the State's informant's contingency fee contract. The trial court shall also make findings of fact regarding whether the prosecutor improperly suppressed evidence in this cause. The trial court shall also make any other findings of fact and conclusions of law that it deems relevant and appropriate to the disposition of Applicant's claim for habeas corpus relief.*

Applicant, Rodney Anderson, does not object to items one through ten of the trial Court's Findings of Fact as the dates of the proceedings and decisions are not at issue.

*B. The statements signed by Corey Brummett and Lindsey Paras.*

11. *"The events which led to the applicant's arrest and prosecution occurred on February 11, 2008."*

Appellant objects that, while the arrest occurred on February 11, 2008, the events leading to his arrest began prior to that date. Jeffrey Harmon, the confidential informant, explains in his interview with writ counsel's defense investigator Jerry Potter, that prior to that date, he was contacted by Sergeant David Womack and told to set up a deal to purchase from Rodney Anderson,

specifically. *See* DX52a at p. 3-5.[2] Mr. Harmon also explained that he contacted Tim Sherber and not Applicant to set up this deal, DX52a at 7, and that they, presumably law enforcement, convinced Harmon that it was not Tim who was selling narcotics. *See* DX52a at 9. Harmon further explained that he did not go to Applicant's side of the vehicle, the passenger side, on February 11, 2008, but that he went to the driver's side, Tim Sherber's side, of the vehicle and then Tim Sherber, not Applicant Rodney Anderson, displayed narcotics to Harmon. *See* DX52a at 11. At trial, Sergeant Womack testified that he had observed Applicant, Rodney Anderson, hold up and display a baggie of narcotics to Harmon. *See* 6RR84.

As described below, Sergeant Womack also testified that he had given the original and only of Harmon's confidential informant contract to Assistant District Attorney Frances Madden, *See* 5RR7-8, & 10, that he was certain that it was the only copy of the contract, and Ms. Madden was blamed for losing the only copy of the contract. *See* 6RR65. Defense counsel was only provided a blank confidential informant contract prior to trial on this premise. At the evidentiary hearing on Applicant's Writ of Habeas, Lieutenant Phillip Cash produced a confidential informant contract purported to be Harmon's original contract, which he stated was found in the Sheriff's Department file of confidential informants. As such,

---

[2] Exhibits for the writ hearing are referred to here as "DX."

Sergeant Womack's testimony that he produced the only copy of Harmon's contract to Frances Madden is incorrect and calls into question much of his testimony at trial. One part of Sergeant's Womack's testimony that seems to be reliable is his explanation that the amount of money Harmon would ultimately be paid increased with the amount of narcotics seized. *See* 6RR112-13.

Trial counsel for Applicant, Chris Tritico, credibly testified that he was not made aware that Sergeant Womack had approached Harmon to set up a deal specifically with Applicant. Tritico also stated that this would have affected his cross-examination of Harmon and Womack, raised defensive issues, and would have changed how he defended the case at trial. As such, defense counsel was not apprised of Harmon's contingency fee contract to specifically target Applicant prior to trial.

12. *"The applicant was initially charged by indictment in Cause No. 08-03-02607- CR in this Court on March 11, 2008, and his first arraignment setting in this Court was scheduled for March 18, 2008."*

Applicant does not object to item 12 of the trial Court's Findings of Fact as the dates of the indictment and the proceedings is not at issue.

13. *"From February of 2008 until December of 2008, the State of Texas was represented in this case by former Assistant District Attorney Frances Madden."*

Applicant does not object to item 13 of the trial Court's Findings of Fact as the

identity of State's counsel is not at issue.

14. *"Madden maintained an "open file policy" and permitted defense discovery of the information regarding this case which she received from the sheriff's office."*

Applicant objects to item 14 in that while Ms. Madden may have maintained an "open file policy," she was not given the confidential informant contract Harmon signed. As stated above, at trial, Sergeant Womack testified that he gave the original and only copy of Harmon's confidential informant contract to Ms. Madden. At the evidentiary hearing and when shown the contract produced by Lieutenant Cash, Ms. Madden credibly testified that she had never seen Mr. Harmon's confidential informant contract and had not been given a copy. As Sergeant Womack's testimony that the Sheriff's Department did not have even a copy of Harmon's contract is directly contradicted by Lieutenant Cash producing a contract seven years later, it would follow that his testimony about giving the contract to Ms. Madden is also incorrect. Regardless, the information about Harmon's contingency fee contract should have been tendered to the defense. Additionally, Ms. Madden did not recall seeing multiple witness statements for any one witness, such as Cory Brummett or Lindsey Paras, and did not recall having knowledge that Caryn McAnarney was involved in the investigation of this case.

It is significant that Ms. Madden did not recall that Ms. McAnarney was

6

involved in this case as her testimony indicated that she would have been very familiar with Ms. McAnarney. Ms. Madden testified that prior to this case, Ms. McAnanrey was a Trooper with the Texas Department of Public Safety. As a prosecutor on a case that Ms. McAnarney had been the investigating and arresting officer, Ms. Madden discovered that Ms. McAnarney had falsified information in her official report. Ms. Madden herself, as an Assistant District Attorney for Montgomery County, filed an official complaint with DPS regarding Ms. McAnarney. Defense counsel testified that he had not been told that the Montgomery County District Attorney's Office had called Ms. McAnarney's veracity into question. Similarly, Mr. Tritico and Ms. Kolski testified that the favorable, material statements of Cory Brummet and Lindsey Paras were not tendered to defense counsel either.

15. *"In March of 2008, Kaitlyn Rice, an employee of attorney Andrea Kolski, visited the district attorney's office on at least two occasions, and was permitted to make a verbatim copy of the police offense report supplements and witness statements that the district attorney's office had received from the sheriff's office at that point in time. Rice made a verbatim copy of approximately five police offense report supplements and two witness statements concerning the events of February 11, 2008, and Kolski transmitted those copies by electronic mail to defense counsel Christopher Tritico in March of 2008."*

16. *"In March of 2008, the district attorney's office did not possess a complete offense report for this case, and the portions in the possession of the district attorney did not include supplements authored by numerous investigators*

*including lead investigator Jim Glisson and crime scene investigator Caryn McAnarney.”*

17. *“Glisson subsequently completed the investigation and tendered to the district attorney's office the remainder of the offense report supplements and witness statements.”*

Applicant objects to items 15, 16, and 17 together. During the course of the hearing, evidence was adduced that an employee of defense counsel, Andrea Kolski, went to the Montgomery County District Attorney's Office to re-type[3] police reports and statements. There was no evidence that this was the only time that Ms. Kolski's employee or either defense counsel, Ms. Kolski or Mr. Tritico, reviewed the materials available to them at the District Attorney's office. To the contrary, Mr. Tritico stated that, due to his trial theory, he would have focused on witness reports describing the officers involved as not being recognizable as police officers and reports that Ms. McAnarney collected the majority of the evidence at the scene including the narcotics evidence, had these materials been made available to the defense. Mr. Tritico testified that he had not seen a report by Ms. McAnarney, *see* DX7, indicating that she had collected the evidence on scene including six white rocks of suspected narcotics.

It was shown at the evidentiary hearing that Ms. McAnarney was allowed

---

[3] Ms. Kolski's employee was allowed to make verbatim copies of the documents she viewed, but she was required to re-type the reports as the District Attorney's Office did not make photocopies for defense attorneys at that time. Ms. McAnarney's report about collecting the drug and other evidence from the scene was not among the reports provided for such copying.  See DX 50, Ms. Kolski's employee's notes.

8

to resign, in lieu of being fired, from the Montgomery County Sheriff's Office for falsifying reports, not conducting testing she claimed to have completed or attempted, and other violations. *See* DX8. Mr. Tritico agreed that this evidence would have heavily impacted the case. As it was necessary for the State to prove at trial that Applicant was aware the officers involved in the bust were in fact law enforcement officers, witness statements showing the officers were not dressed in attire that would identify them as police officers, i.e. badges, vests, and jackets identifying them as law enforcement, would have been useful to the defense and would have been utilized by the defense, due to both defense counsels' experience and tenure as competent trial attorneys, if these statements would have been made available to defense counsel.

Furthermore, the testimony of Assistant District Attorney Sherri Culbertson revealed that the prosecution did not make direct disclosures of favorable, material evidence as per their duties under *Brady* and progeny. Ms. Culbertson stated that the prosecution allowed the defense to review case materials and merely relied on this to allegedly fulfill their duties under *Brady* and its progeny. The office did not notify counsel when new information was placed in the file and Ms. Culbertson took reports out of the file to make her own copies during the Sherber trial. She could not account for how the file was maintained and what was provided to Mr. Tritico and Kolski during Anderson's earlier trial. No logs were kept to show what

9

documents the defense was given access to. As the defense would have heavily focused on Ms. McAnarney's involvement in evidence collection and witness statements showing the officers involved could not be identified as law enforcement, had such documents been made available to the defense based upon the testimony of Mr. Tritico and Ms. Kolski, these documents obviously were not disclosed to the defense. Additionally, Ms. Culbertson testified that documents were removed from the files in order for the prosecution team to make copies, demonstrating that the documents in question would and could have been removed from materials made available to the defense at various times.

18. *In January of 2009, Assistant District Attorney Rob Freyer was assigned to serve as the chief prosecutor in this Court and became responsible for the prosecution of the applicant and his co-defendant.*

19. *Assistant District Attorney Sheri Culberson was assigned to this Court in 2009 and assisted Freyer in the trial of this case before assuming the role of the lead prosecutor in the co-defendant's trial.*

20. *Based upon the credible affidavit of Freyer and the credible testimony of Culberson, the· Court finds that the State maintained an "open file policy" both prior to and during the trial of this case, and that the contents of the State's file-including all offense report supplements and witness statements received from the sheriff s office-were available for review by counsel for the defense.*

21. *There is no evidence that any sheriff's deputy or prosecutor intentionally or unintentionally withheld from disclosure to the prosecution or the defense any particular offense report supplement or witness statement.*

22. *The State's file for this case presently contains copies of the four handwritten statements signed by witnesses Corey Brummett and Lindsey*

*Paras on February 11, 2008, and February 12, 2008.*

23. *Based upon Culberson's credible testimony, including her identification of her handwritten notations on the copies of the statements contained in the State's file, the Court finds that copies of the handwritten statements signed by Paras and Brummett on February 11, 2008, were present in the State's file during her preparation for the trial of this case, and were available for review by counsel for the defense.*

Applicant objects to items 18 through 23 together. Ms. Culberson testified that she was assigned to the 359th Judicial District Court, the Court in which this trial took place, a few weeks prior to trial, so she was not knowledgeable about what was in the file or what had been furnished to defense counsel in discovery as discovery had already been completed with the exception of the specific request for information about Ms. McAnarney. As such, she agreed that she was not aware of and had no direct knowledge about the discovery or disclosure practices used in this case prior to her being assigned to the Court. Ms. Culberson testified that Mr. Freyer did enjoy showing defense counsel in various cases the amount of documents, reports, and statements he had in order to intimidate or gain a psychological advantage over defense counsel. One could infer from this statement that favorable materials may not have been shared with defense counsel as disclosing numerous favorable documents would have the opposite effect on defense counsel as Ms. Culberson described Mr. Freyer intended.

Ms. Culbertson also testified that she was the second chair prosecutor for

Applicant's trial and first chair prosecutor for codefendant, Timothy Sherber. Because of this, Ms. Culberson would have reviewed and made notations on documents from the same investigation in two separate trials. Additionally, the notations Ms. Culberson identified were brightly colored "sticky-tabs," which she believed she alone, out of anyone in the Montgomery County District Attorney's Office, used. The State did not ask her to identify any written or dated notation. No evidence was offered to show that the notations made on witness statements by Ms. Culberson were made in preparation for Applicant's case and not his codefendant, who was tried after Applicant. There was also no evidence adduced that these statements had been made available to the defense due to Ms. Culberson, the lead prosecutor for Applicant's codefendant, placing "sticky-tabs" on the documents at some point in time. There were no other sticky tabs contained on the documents visible in the State's file.

The State failed to call Rob Freyer, lead prosecutor in Applicant's trial, who would have been responsible for discovery and disclosures of favorable evidence beginning in January 2009, after the State claimed they did not have a complete file of the case. No communications between Mr. Freyer and trial defense counsel regarding favorable evidence disclosures were produced, nor were any alleged to exist. Mr. Freyer's affidavit mentions that the State's consolidated file for the Anderson and Sherber cases presently contains both the February 11 and February

12

12, 2008 statements of Lindsey Paras and Corey Brummett. Referring to the file as being consolidated shows that separate files of materials and documents were kept, separately, for each trial but have now been consolidated into a single file for storage. Mr. Freyer's affidavit states he cannot recall these statements specifically and makes no assurances that they were made available for trial defense counsel to review. The State also made the representation that he could not represent what was in the State's file at any given time.

It is also not determinative that the State's file now contains multiple statements by Lindsey Paras and Corey Brummett as it was neither alleged nor proven when these statements were placed in the State's file. Furthermore, counsel for the State at the evidentiary hearing, Bill Delmore admitted on the first day of the hearings that the State was unable to determine what documents had been in the State's file at what time as the file had also been used during Timothy Sherber's trial. What can be determined is that these statements were taken on February 11th and February 12th, 2008, and would have been in possession of law enforcement, part of the prosecution team, by the time of trial, and would have been available for disclosure after their creation. But Mr. Tritco and Ms. Kolski had no trouble recalling that they had not been furnished these statements. This is because they figured prominently in their defense theory that Anderson had no idea that the police were approaching Sherber's truck in the Kroger parking lot. Paras

13

and Brummett's testimony and statements reveal the same. Amy Vollart also testified that he could not tell police were involved. Each of these witnesses were disinterested and credible.

24. *The statements signed by Brummett and Paras on February 12, 2008, were slightly longer and more detailed than the statements signed on February 11, 2008.*

25. *The statements signed on February 11, 2008, do not include any information of significance that is not also included in the statements signed on February 12, 2008.*

26. *Neither Tritico nor Kolski were able to recall whether or not the statements signed by Paras and Brummett on February 11, 2008, were made available to them prior to or during the trial in this case.*

27. *Any suggestion that the February 11, 2008, statements were withheld from disclosure is not credible, particularly because the statement given by Brummett on February 12, 2008, begins with the statement, "I am clarifying a previous statement to better help the investigation."*

28. *Tritico testified that he delivered his trial filed to Steve Jackson, the attorney who represented the applicant in the direct appeal from his conviction.*

29. *Jackson produced, in this Court, what appeared to be a file consisting of materials obtained from Tritico and Kolski and materials collected during the appellate process, but neither Tritico nor Kolski were able to state whether Jackson's file contained all of the materials that were contained in their respective files during the trial of this case.*

30. *The applicant has not proven by a preponderance of the evidence that the statements signed by Paras and Brummett were withheld from disclosure, prior to and during the trial of this case, by counsel for the State.*

31. *Neither Paras nor Brummett were called as witnesses during the*

*applicant's trial, although the applicant did call as a witness Chris Neal, who was also a civilian eyewitness to the events leading to the applicant's arrest and prosecution.*

Applicant objects to items 24 through 31 together. The February 12, 2008 statements of Lindsey Paras and Corey Brummet were longer and more detailed than their February 11, 2008 statements as both subsequent statements added details that the officers involved were wearing clothing identifying them as law enforcement officers, which is noticeably missing from their initial statements. While the February 11 statements do not include information not found in the February 12, 2008 statements, it is what their February 11 statements, made immediately after witnessing the events, <u>lack</u> that is of utmost importance.

Their February 11 statements do not state that the officers involved in the incident were wearing clothing that indicated that they were law enforcement officers. In her February 11 statement, *see* DX13, Paras writes that she observed a "white man with grey hair pulled back into a ponytail" pull out a gun before ducking and hearing shots being fired. *See* DX13. She then writes that she saw another individual, "a bigger white male," being pulled out of a silver truck and being placed on the ground. *See* DX13. Paras makes no discernable distinction between the man she observed pulling a gun, ostensibly one of the officers, and the defendant she saw being taken out of the grey dually other than that one of them was armed. She does not write that she was aware that the man with a gun was a

15

law enforcement officer or that he was wearing a raid vest or other clothing article that identified him as a police officer. In fact, it seems that she was quite unaware that the armed individual was a police officer as she writes that upon seeing the man pull a weapon she "yelled to [her] other co-workers 'Oh my god he's got a gun'" and ducked. *See* DX13. Even Brummet's mention of "undercover" police officers in his February 11, 2008 statement, *see* DX3, indicates that the officers were not wearing clothing or insignias visibly indicating them as police officers.

Lindsey Paras and Amy Vollart, who also worked at the Blockbuster with Paras, testified at the evidentiary hearing that they observed a man standing near the entrance of their Blockbuster store on February 11, 2008. The man was not dressed in a manner that indicated that he was a law enforcement officer. In fact, both testified that they were apprehensive to go outside the store on break with this man present because they were worried he might have had the intention to rob the Blockbuster, reinforcing that he was not dressed in clothing identifying him as law enforcement. Paras and Vollart testified that they later saw the same man participate in the arrest of Applicant and his codefendant. Neither Paras nor Vollart could identify the man, one of the officers involved in the arrest, as a law enforcement officer by his clothing, an insignia, or his appearance. It was not until after the bust and arrest were completed, and they were interviewed, that either understood that this had been an arrest by law enforcement officers.

Cory Brummet, who did not have a clear recollection of the events on February 11, 2008, testified at the evidentiary hearing that in his experience as a Montgomery County Sheriff's Deputy, officers from one department do not wear clothing identifying them as being a member of another department during police operations. Brummet's February 12, 2008 statement purports that ten officers wearing clothing identifying them as Conroe Police Narcotics officers were involved in the arrest. *See* DX4. Brummet's testimony shows his February 12 statement to be inaccurate as only one officer from the Conroe Police Department was involved in the arrests, not ten. Additionally, while Brummet's February 12 statement does say that he is clarifying a previous statement, it does not state that he is clarifying a previous written statement as pointed out by Mr. Tritico. Nothing in Brummet or Paras' February 12 statements indicate that they had made prior written statements, especially prior written statements indicating that the officers involved in Applicant's arrest were not wearing clothing identifying them as law enforcement officers.

Chris Tritico did not recall having seen either Paras or Brummet's February 11, 2008 statements made on Conroe Police Department forms and neither he nor Andrea Kolski recalled seeing contravening statements for witnesses. Both Mr. Tritico and Ms. Kolski made an *in camera* review of their trial files, and attorney Steve Jackson's appellate file, who handled Applicant's appeal with Ms. Orr who

is counsel on the writ, with the Court. All documents and reports that had been produced for trial by the Montgomery County District Attorney's Office, and those non-privileged documents directly relating to same, were produced to Counsel for the State at the evidentiary hearing in the Court's presence. The statements in question by Paras and Brummet were not found in trial defense counsel's files. Additionally, trial defense counsel testified and agreed that the February 11, 2008 statements would have allowed them to fully investigate the issue of whether the officers involved in the bust and arrests were wearing clothing that indicated they were police officers and make the determination to call Paras and Brummet as witnesses. Mr. Tritico, lead trial counsel, stated that part of the trial defense was that the officers were not wearing identifiable clothing and the February 11, 2008 statements would have been material to the defense. So neither he nor Ms. Kolski had these prior statements at their disposal during trial.

Lindsey Paras and Cory Brummet were not witnesses at trial because their February 11, 2008 statements were not disclosed to defense counsel. As stated above, trial defense counsel testified that part of the defensive theory was that the officers were not dressed in clothing identifying them as law enforcement officers and that Applicant and his codefendant thought that they were being robbed when approached by multiple persons armed with handguns and a baseball bat. Paras' testimony, as shown in the evidentiary hearing, would have aided the defense in

18

proving this theory. Brummet's testimony presumably would have done the same upon examination of his February 11, 2008 statement.[4] While Chris Neal did testify at trial, the information he testified to at the evidentiary hearing did not come out at trial as it was not known to the defense. Neal testified that he too was unable to identify the persons involved in the event on February 11, 2008 as law enforcement officers until the man demanding his identification <u>pulled out a badge from underneath his shirt</u>. Neal recalled telling an investigator this, and clearly recalled what the investigator looked like, but could not recall who the investigator worked for. But, from Mr. Tritico's testimony and description of his investigator for trial, it is clear that Neal did not tell this to the investigator for Applicant's case. Mr. Tritico's investigator has a full head of hair and Mr. Neal spoke to a balding investigator. Trial Defense counsel was unaware of these facts and had the defense been aware, counsel would have inquired about them as one of the defensive theories was that the officers involved in the incident were not wearing clothing identifying them as law enforcement officers. What is clear is that as these

---

[4] At the evidentiary hearing, Brummet could not clearly recall the events he witnessed on February 11, 2008. This is understandable, as some seven years has passed since the event. Additionally, Brummet is now employed as a deputy for the Montgomery County Sheriff's Department, coincidentally the agency in charge of the overall police bust in 2008. In his duties as a deputy, Mr. Brummet has presumably been involved in numerous arrests, which may have made the events he witnessed on February 11, 2008 less remarkable to him now. Had his initial statement been made available to the defense prior to trial, the defense would have been able to interview and call Brummet as a witness prior to his becoming a deputy, which would have meant the events of February 11, 2008 would have been as indelible to him as they are to Paras and Vollart today.

witnesses were interviewed by police officers and made written statements, in addition to any verbal statements made at the time, on official police forms, the prosecution team was aware of material, favorable information that was withheld from the defense. Mr. Tritico and Ms. Kolski were emphatic that had they had the statements of these witnesses they would have recalled seeing them and would have used these witnesses or their statements at trial.

### C. Confidential informant Harmon's "contingency fee contract."

32. *Confidential informant Jeffery Harmon did not sign any "contingency fee contract" to provide assistance in connection with the investigation leading to the applicant's arrest, as he was paid a fixed amount for his assistance in advance of the applicant's arrest.*

33. *Harmon did sign on February 11, 2008, a written agreement to abide by the Montgomery County Sheriff's Office guidelines for the conduct of confidential informants.*

34. *Harmon's agreement to abide by the Montgomery County Sheriff's Office guidelines was included in a "confidential source packet" prepared by Sergeant David Womack.*

Applicant objects to items 32 through 34 of the Findings of Fact and Conclusions of Law together. Testimony at trial was that the amount of compensation given to a confidential informant increased with the amount of narcotics seized. *See* 6RR112. The informant contract produced by the State for the evidentiary hearing is problematic for several reasons. At trial, Sergeant Womack and Detective Likens testified before the trial Court, under oath, that they had given the only copy of the original contract to the Assistant District Attorney, Frances Madden, who

supposedly lost it. They also testified that she was given the only copy of the contract. 5RR7, 8, & 10; see also 6RR65. Assistant District Attorney Mr. Rob Freyer, the prosecutor during the trial, advised the trial Court that the contract had been lost by Ms. Madden. *See* 5RR7. As stated above, at the evidentiary hearing Ms. Madden testified that she had not seen this informant contract and it was not given to her. This is supported by the fact that it was found in the Sheriff's Department files and produced by the State.

Lieutenant Cash, of the Montgomery County Sheriff's Department, testified that Sergeant Womack utilized another informant's contract, drew a line through that informant's name, and had Jeffery Harmon sign that informant's contract. He also testified that the "other informant" is still currently an informant for law enforcement and that this "other informant's" name was still legible when Harmon signed the contract. Lt. Cash stated that the initials on each point of the Confidential Source Code of Conduct were "J.A.," which are not Jeffery Harmon's initials. Additionally, trial testimony was that Sergeant Womack reviewed the source packet with Jeffrey Harmon and had Harmon sign the document on the day of the incident, February 11, 2008. 6RR113-14. The contract produced by the State is dated either July 23, 2006 or July 23, 2007, as the numerals "6" and "7" are written in over each other for the year. Also, the blank for "Date of Document" on the Confidential Source Worksheet page has no indication of the date. The events

21

of this case occurred in 2008.

The contract also indicates that a complete criminal history/RAP sheet, a drivers license history, a recent photograph/fingerprint card, District Attorney contract, and a warrant check "is required and shall be attached to the Confidential Source Packet as part of the permanent file." The blanks for each of these documents are unchecked and none of these documents accompany the contract produced by the State. As such, the packet cannot be said to be complete and any assertion that no other documents were produced or created in connection with this contract or the agreement with Harmon is questionable.

Furthermore, the contract does not encompass the agreement that Harmon described in his statement to the defense investigator, that he was to, not work a deal for narcotics, but to specifically target Applicant. *See* DX52a at p.3-5. The State did also produce a receipt for $200.00 paid to Harmon, signed on February 11, 2008 at 8:00pm, hours after the arrest. As the receipt was signed after the arrests were complete, it cannot be said that this amount was not the result of a contingency agreement as it was tendered after the police allegedly found the narcotics at the scene. Harmon hedged his testimony at trial and it was weak at best concerning Anderson's involvement in any phone calls setting up a drug buy, or any arrangements to provide money for an amount o drugs. Harmon's recorded statement, offered as an offer of proof emphasized that he was to target Mr.

22

Anderson for Sgt. Womack.

Within the Confidential Source Code of Conduct is a section stating "I understand that I am not entitled to, nor do I expect any benefits for the cooperation and voluntary assistance that I provide to the Special Investigations Unit unless it is otherwise stated in a written contract from the District Attorney's Office." Sergeant Womack testified at trial that he told Harmon that he would make money by assisting in the bust. 6RR112-13. Womack also testified that while he supposedly didn't directly tell him, Harmon was somehow aware that the amount he would be paid would increase with the amount of narcotics found. *See id.* While the defense was aware that Harmon had been paid a sum of money, they were not aware that a pending case of his, the one he was granted a personal recognizance bond for during Applicant's trial, was going to be dismissed following his testimony in Applicant and his codefendant's trials. The defense was not told about the seriousness of the offense, but were told it was a mere failure to stop and give information. And no such written agreement by the District Attorney's office was provided to the defense.

35. *Womack utilized a "confidential source packet" that he previously filled out with the name of another informant, and he scratched out the name of the other informant and wrote Harmon's name above it.*

36. *The confidential source packet prepared in connection with this investigation also included a receipt reflecting Womack's payment of $200.00 in cash to Harmon, signed by Womack and Harmon.*

23

37. *The confidential source packet prepared in connection with this investigation could not be located by the Montgomery County Sheriff's Office or counsel for the State prior to or during the applicant's trial, and it was not provided to counsel for the defense at any time prior to or during the trial.*

38. *In lieu of admitting Harmon's confidential source packet, counsel for the State offered into evidence (as State's exhibit 211) a blank confidential source packet that had not been filled out with the information regarding an informant, but was otherwise identical to the packet which Womack prepared with Harmon (6 R.R. 66-67).*

39. *According to the credible testimony of Lieutenant Philip Cash of the Montgomery County Sheriff's Office, Cash recently found Harmon's confidential source packet and the receipt prepared in connection with this investigation in a box of confidential informant records in the office of the sheriff's Special Investigation Unit.*

Applicant objects to items 35 through 39 together. As stated above, Sergeant Womack testified before the Court, and during his trial testimony, that he had given the original and only copy of Harmon's informant contract to Frances Madden of the Montgomery County District Attorney's Office and that she had lost it. Not only did Ms. Madden testify that she had never seen this contract, the original was located in the Sheriff's Department files, proving Sergeant Womack's sworn statements to be false. As his statements regarding the whereabouts of the informant contract were false, his statements that the blank contract was identical to the one he filled out with Harmon are questionable and the face of the contract produced seven years after trial also demonstrates this.

Lieutenant Cash did testify that he found Harmon's informant contract in the

records of the Sheriff's Department. He also stated that he was not aware that the file was missing at the time of trial. This statement is in contravention to the statements made within his affidavit that he had made a notation that the file was missing on "08/09." Cash also testified that the Special Investigations Unit (SIU) may, on very rare occasion, keep seized narcotics evidence in their office, separate from the main Sheriff's Department headquarters, over a weekend if a seizure occurred late on a Friday and the amount was small. He emphatically stated that narcotics would never be kept there for a month or more. A property inventory report, filled out by Sergeant Womack, indicates that Womack kept the narcotics allegedly seized on February 11, 2008 at the SIU office (or in his personal possession) for over a month until March 14, 2008, when he logged them into evidence. *See* DX45, tab no.2 in the packet attached to the business records affidavit signed by Damon W. Hall. This form, used to track evidence, does not show these narcotics were sent to DPS for testing prior to Applicant's trial, *see* id; *see also* DX51, calling into question the collection, handling, and storage of this evidence prior to trial.

40. *The receipt produced by Cash, reflecting a payment of $200 to Harmon on February 11, 2008, corroborates Womack's testimony at trial that he paid Harmon $200 for his assistance in this case.*

41. *The receipt reflecting a payment of $200 to Harmon is slightly inconsistent with Harmon's testimony that he recalled being paid between $300 and $400.*

42. *The receipt could not have been used effectively to impeach Harmon, in light of Harmon's testimony that he did not remember the precise amount of his payment.*

43. *The jury was informed that Harmon was a paid informant who received $200 for his assistance; and the precise amount of Harmon's compensation was not a significant issue in the case.*

Applicant objects to items 40 through 43 of the Findings of Fact and Conclusions of Law together. As stated above, Sergeant Womack made false statements when he swore under oath upon specific inquiry by the court that he gave the original and only copy of Harmon's informant contract to Ms. Madden prior to trial. Due to these false statements, the defense was not provided a copy of this contract prior to or during trial and Womack's statements regarding his agreement with Harmon, and other issues, are called into question.

The actual numeric figure of the sum of the amount of money Harmon was paid is not at issue here. What is at issue is the agreement behind Harmon's reward. Harmon recalls being paid one and a half to double the amount the State claims and Womack testified to. Harmon recalling being paid that much more indicates that he received more than what is shown on the receipt attached to the informant contract that is also missing numerous required documents, as discussed above. The contract and receipt produced by the State and Womack's testimony at trial do not account for Harmon being told to specifically target Applicant, Harmon's pending serious criminal matter being dismissed, or Harmon being

26

threatened with incarceration should he not cooperate and testify to the story he told at trial. They also do not account for Womack stating that informants get paid more for more narcotics being seized and stating Harmon somehow knew he would be paid an amount of money commensurate to the amount of narcotics found without being told. *See* 6RR112-13. And, as mentioned above, Harmon was paid <u>after</u> the narcotics in this case were to have been seized. No agreement for a flat fee was made before the seizure. While the jury was informed that Harmon was paid $200, they were not told his case was going to be dismissed, they were not told that Harmon had been told to target Applicant, they were not told that threats had been made against Harmon to cooperate.

### D. *Crime scene investigator Caryn McAnarney.*

44. *The prosecution formally notified defense counsel in July of 2009 that the Montgomery County Sheriff had terminated the employment of crime scene investigator Caryn McAnarney because of general incompetence and false statements in her reports of testing of evidence.*

45. *The defense was provided with access to McAnarney's personnel file (2 R.R. 31, 33).*

46. *The defense served the sheriff's office with a Public Information Act request for information regarding fifty-five specific cases in which McAnarney was suspected of making false statements in her reports, and moved for a continuance of this case to await the sheriff's response.*

47. *During the hearing on the motion for continuance, counsel for the State acknowledged that McAnarney assisted in processing the crime scene, and that she handled the methamphetamine recovered at the scene of the offense and logged it into evidence; but a prosecutor informed the Court that she was not necessary to establish a chain of custody and*

27

*would not be called as a witness (2 R.R. 14, 33-34).*

48. *The Court denied the applicant's motion for continuance on grounds that the applicant failed to show that any prejudice would result from denial of the motion (2 R.R. 35).*

49. *McAnarney was not called to testify by either party during the applicant's trial; and the testimony of other witnesses was sufficient to establish the chain of custody of the seized methamphetamine, and revealed that McAnarney did not have a significant role in collecting or processing the evidence in this case.*

50. *The appellate record of the applicant's trial reflects that counsel for the defense was aware of the video recording made by McAnarney which portrayed the "walk-through" interview of officer Stewart Hightower.*

Applicant objects to items 44 through 50 of the Findings of Fact and Conclusions of Law together. Assistant District Attorney Rob Freyer called defense counsel toward the end of July 2009 and informed the defense that Caryn McAnarney had been "let go because of general incompetence and forging lab results." 2RR17. There was no formal, written notice given to the defense. *See* 2RR18. Even the Court stated that it was unaware that "anybody from the Sheriff's Department had been dismissed because of incompetence." 2RR17. Defense counsel was not told what cases were impacted and had to discover what cases, and whether the instant case was, on their own. *See* 2RR15, 18, & 23. Mr. Freyer also told the Defense that Ms. McAnarney was unnecessary to Anderson's case because she played a minor role. As of the Friday preceding trial, which began on Monday, and at the hearing on their motion for continuance, defense counsel told the Court

28

they had never received "any written Brady notification regarding what Brady information there is, how extensive it is, [or] where to go to find it." 2RR23. Instead of tendering *Brady* evidence, the State told the Court that they would not call McAnarney as a witness. *See* 2RR12.

Defense counsel was able to review a personnel file, or a portion of it, for McAnarney due to Ms. Kolski's husband's involvement in another criminal case. *See* 2RR30-31. Defense counsel was able to identify that there were numerous cases in which McAnarney's integrity was called into question, and had subpoenaed further information on those cases. But defense counsel was told by the Sheriff's Department that the information could not be gathered in time for trial. *See* 2RR6-7. In regards to this, the State argued that "to say that her credibility has been challenged 55 times, means simply that she has been confronted 55 times at trial." 2RR9. At the hearing on the motion to continue, defense counsel informed the Court that they still had not been able to determine whether any of the reports in which McAnarney forged lab results applied to this case as they had only discovered these cases the previous week. *See* 2RR17-18. Counsel still did not know that McAnarney collected and processed the drug and other evidence in this case.

At the hearing on the motion to continue, defense counsel did request additional time in order to obtain and review records to determine the extent of

McAnarney's misconduct, as well as for other issues including being informed by the State for the first time that Applicant's codefendant was to now testify against him the Thursday before trial. *See* 2RR8. Absent in the hearing during argument regarding the codefendant, Tim Sherber's, potential testimony is any disclosure, or mention of disclosure by the State, that Sherber had initially given an interview to Detective Glisson that exculpated Applicant before asking for a cooperation deal in which he would blame Applicant. The defense had been informed that Detective Glisson, due to an injury to his son in service to this country, would not be available for trial. *See* 2RR8. At the evidentiary hearing, Mr. Tritico stated that the defense was unaware that Sherber had given a favorable statement regarding Applicant and had then attempted to elicit a deal and blame Applicant.

Prior to trial, the State told the Court that they could not "imagine how anything [Caryn McAnarney], no matter how fraudulent she may be, that could have any influence on the proof of this case." 2RR33. The State downplayed McAnarney's role in the collection of evidence in the case, saying she handled the drugs in the case "at one time" and logged them into evidence and that other evidence technicians would be available to explain the collection of evidence at the scene. *See* 2RR34. What McAnarney logged into evidence was six white rocks, not the bags of alleged powdered narcotics used as evidence at trial. *See* 6RR23; 6RR37; DX7. At the evidentiary hearing, Mr. Tritico testified that he was unaware

of six white rocks being collected at the scene and had not seen her report recounting such.

At trial, Deputy Kellum testified that he, and not McAnarney, collected the alleged powdered narcotics and placed it into baggies. 8RR62-63. As mentioned above, it was Sergeant Womack who logged in the alleged powdered narcotics into evidence over a month after the incident. *See* DX45, tab no.2 in the packet attached to the business records affidavit signed by Damon W. Hall. Defense counsel was not told that McAnarney had been in charge of the scene, had directed the other evidence technicians, and had collected the vast majority of the evidence at the scene. They were not told that she collected alleged narcotics evidence that was vastly different from the evidence brought to trial. More importantly, in an offer of proof, counsel was able to present DPS lab evidence that the drugs in this case had changed weight, chemical analysis and character. This calls all of the drugs in this case into question.

CONCLUSIONS OF LAW

1. *There remain no previously unresolved issues of fact material to the legality of the applicant's convictions and sentences, and no additional evidentiary hearing is required.*

2. *The statements signed by witnesses Brummett and Paras on February 11, 2008, were neither exculpatory nor material to the outcome of the case.*

The statements of Brummet and Paras on February 11, 2008 were absolutely exculpatory and material to the outcome of the case. Evidence is material "if the suppressed evidence undermines confidence in the jury's verdict." *Kyles v. Whitley*, 514 U.S. 419, 432 (1995); *see also Blackmon v. Scott*, 22 F.3d 560, 564 (5th Cir. 1994); *Ex parte Adams*, 768 S.W.2d 281, 290 (Tex. Crim. App. 1989). The *Kyles* decision clarifies four significant aspects of materiality analysis under *Brady*. First, to demonstrate materiality, Applicant is not required to demonstrate by a preponderance of the evidence that the suppressed evidence, if known to the defense, would have resulted in a different outcome. *See Kyles*, 514 U.S. at 434–35. The inquiry is, more properly, whether the suppressed evidence undermines confidence in the jury's verdict or sentence. *Id*. Second, materiality analysis "is not a sufficiency of the evidence test." *Id*. The Supreme Court clearly stated, "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left" to support the jury's decision. *Id*. A defendant demonstrates a *Brady* violation by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. Third, harmless error analysis is not applicable to *Brady* violations; thus, once this court has found constitutional error, there is no need for further harmless error review. *Id*. Finally, materiality must be assessed "in terms of the suppressed evidence

considered collectively, not item by item." *Id*.

In order to be convicted of aggravated assault against a public servant, the defendant must be found to have known the person is a public servant. *See* Tex. Penal Code § 22.02(b)(2)(B). Paras and Brummet's February 11, 2008 statements support that Applicant and his co-defendant, Sherber, who was driving, were not aware that the individuals approaching Sherber's grey dually were police officers.

The February 11 statements of Paras and Brummet recount a scene dissimilar to that painted by the prosecution at trial. Paras writes that she observed a "white man with grey hair pulled back into a ponytail" pull out a gun before ducking and hearing shots being fired. *See* DX13. She then writes that she saw another individual, "a bigger white male," being pulled out of a silver truck and being placed on the ground. *See* id. Paras makes no discernable distinction between the man she observed pulling a gun, ostensibly one of the officers, and the defendant she saw being taken out of the grey dually other than that one of them was armed. She does not write that she was aware that the man with a gun was a law enforcement officer or that he was wearing a raid vest or other clothing article that identified him as a police officer. In fact, it seems that she was quite unaware that the armed individual was a police officer as she writes that upon seeing the man pull a weapon she "yelled to [her] other co-workers 'Oh my god he's got a gun'" and ducked. *See* id. While one may fear injury due to an errant shot, people

33

are not usually shocked that someone identifiable as a police officer is armed. People usually become terrified when random strangers, especially ones who resemble someone you would cross the street to avoid, brandish firearms and baseball bats in public. A number of disinterested witnesses testified at the writ hearing that they could not tell that police officers were involved until after all of the car colliding and shooting had concluded, but the defense had been chilled from calling these persons as witnesses at trial as their favorable statements had been suppressed and not made known to trial defense counsel.

In addition to her February 11, 2008 statement, Paras testified at the evidentiary hearing, as described above, that she was unable to identify the man who had stood outside her store and later participated in Applicant and co-defendant's arrests as a law enforcement officer. To the contrary, she had been afraid to exit her workplace, Blockbuster Video, as she feared the man might have had the intention to rob the store. This is not something someone would think of an individual dressed in a jacket or shirt and wearing a badge identifying him as a police officer.

Brummett's February 11 statement is similarly devoid of any mention that individuals on the scene were wearing raid vests or other articles of clothing that would identify these persons as police officers. While Brummet does write that he observed "undercover cops" pull out their guns and fire on the truck and then

surround the defendants, one can assume that as his statement was given to police officers on a form marked "Conroe Police Department Field Witness Statement," that Brummet had been told that the armed individuals he saw were undercover officers by the time he wrote his statement. *See* DX3. Nowhere on his February 11 statement does Brummet indicate that he was able to identify the individuals as law enforcement officers by their clothing or other indicia of law enforcement while events were unfolding. Brummet's testimony at the evidentiary hearing that officers do not wear clothing identifying them as a member of another department while working directly contradicts the assertion in his February 12, 2009 statement that ten officers wearing shirts identifying them as Conroe Police Officers were present at the bust because only one Conroe police officer was involved.

The February 11, 2008 statements of Paras and Brummet, who had no stake in the outcome of Applicant's case, contradicted the testimony of the officers involved in Applicant's arrest and exculpates Applicant. As such, their statements were material and exculpatory to the outcome of Appellant's case.

3.  *The contents of Harmon's confidential informant packet and the receipt reflecting Womack's payment of $200 to Harmon were neither exculpatory nor material to the outcome of the case.*

Jeffery Harmon's confidential informant packet and the actual agreement made with him are favorable and exculpatory to Applicant and are material to his case. As described above, Jeffrey Harmon, the confidential informant, explained in

35

his interview with writ counsel's defense investigator that prior to February 11, 2008, he was contacted by Sergeant David Womack and told to set up a deal to purchase from Rodney Anderson specifically. *See* DX52a at p.3-5. Mr. Harmon also explained that he contacted Tim Sherber and not Applicant to set up this deal, DX52a at 7, and that "they," presumably law enforcement, convinced Harmon that it was not Tim who was selling narcotics. *See* DX52a at 9. That Harmon was directed to target Applicant, instead of being told to just set up a controlled buy of narcotics, is not reflected in the informant contract.

Trial counsel for Applicant, Chris Tritico, credibly testified that he was not made aware that Sergeant Womack had approached Harmon to set up a deal specifically to target Applicant. Tritico also stated that this would have affected cross-examination, raised defensive issues, and would have changed how he defended the case at trial.

Sergeant Womack's testimony at trial was that the amount of compensation given to a confidential informant increased with the amount of narcotics seized. *See* 6RR112. This is not reflected in the confidential informant contract. The State did also produce a receipt for $200.00 paid to Harmon, signed on February 11, 2008 at 8:00pm, hours after the arrest. As the receipt was signed after the arrests were complete, it is consistent with the contingency fee agreement that Harmon said existed. Harmon came to court to testify, but his testimony was not permitted

by the trial court. Counsel offered his interview as an offer of proof of what he would have said had he been called. There is also nothing showing that this amount was the only amount of money paid to Harmon and that nothing was tendered to him when he made his subsequent statement inculpating Anderson for officers.

Within the Confidential Source Code of Conduct is a section stating "I understand that I am not entitled to, nor do I expect any benefits for the cooperation and voluntary assistance that I provide to the Special Investigations Unit unless it is otherwise stated in a written contract from the District Attorney's Office." Sergeant Womack testified at trial that he told Harmon that he would make money by assisting in the bust. 6RR112-13. He also testified that while he supposedly didn't directly tell him, Harmon was somehow aware that the amount he would be paid would increase with the amount of narcotics found. *See* id. Harmon was also aware that he was not being charged for driving while intoxicated and hit and run. And he knew that he would be placed in custody if he did not testify as he did at trial. While the defense was aware that Harmon had been paid a sum of money, they were not aware that a pending case of his, the one he was granted a personal recognizance bond for during Applicant's trial, was going to be dismissed following his testimony in Applicant and his codefendant's trials and that he had avoided incarceration by testifying. No such agreement by the District Attorney's office or law enforcement was provided to the defense.

Harmon's contingency fee agreement to specifically target Applicant was not memorialized in the written contract produced by the State. But, the contract produced for the evidentiary hearing itself is material and favorable to Applicant. Trial defense counsel was chilled from cross-examining Harmon and Womack regarding their contingency fee agreement because the true nature of their agreement, which would have been favorable to Applicant, was not disclosed to the defense and the defense had only been told of the inculpatory statements of Harmon, which he now recants.

Sergeant Womack testified that he had given the original and only of Harmon's confidential informant contract to Assistant District Attorney Frances Madden, *See* 5RR7,8, & 10, and Ms. Madden was blamed for losing the only copy of the contract. *See* 6RR65. Defense counsel was only provided a blank confidential informant contract for trial on this premise. At the evidentiary hearing on Applicant's Writ of Habeas, Lieutenant Phillip Cash produced a confidential informant contract purported to be Harmon's original contract, approximately six years after Applicant's trial, which he stated was found in the Sheriff's Department file for confidential informants. As such, Sergeant Womack's testimony that he produced the only copy of Harmon's contract to Frances Madden is incorrect and calls into question much of his testimony at trial.

The contract produced at the evidentiary hearing is problematic for several

reasons. Lieutenant Cash, of the Montgomery County Sheriff's Department, testified that Sergeant Womack utilized another informant's contract, drew a line through that informant's name, and had Jeffery Harmon sign that informant's contract. He also testified that the "other informant" is still currently an informant for law enforcement and that this "other informant's" name was still legible when Harmon signed the contract. Lt. Cash stated that the initials on each point of the Confidential Source Code of Conduct were "J.A.," which are not Jeffery Harmon's initials. Additionally, trial testimony was that Sergeant Womack reviewed the source packet with Jeffrey Harmon and had Harmon sign the document on the day of the incident, February 11, 2008. 6RR113-14. The contract produced by the State is dated either July 23, 2006 or July 23, 2007, as the numerals "6" and "7" are written in over each other for the year. Also, the blank for "Date of Document" on the Confidential Source Worksheet page has no indication of the date.

The informant contract is material and favorable as it demonstrates Sergeant Womack's testimony was incorrect. Womack was the officer in charge of the police operation. As shown above, he logged in the narcotic evidence used at trial a month after the arrests. When viewed in light of Lieutenant Cash's emphatic denial that narcotics would have been maintained by the Special Investigations Unit for a month, this calls into question the narcotic evidence produced at trial and raises questions about its source. This is especially true since it nature, weight and

character changed. Additionally, and as Mr. Tritico testified the defense was not told, Caryn McAnarney reported to have collected six white rocks of suspected narcotics from the scene and that she collected, logged and processed the evidence in this case.

These six white rocks were sent to the DPS lab to be tested for cocaine despite this being an operation the officers set up to obtain methamphetamine and claim that they found methamphetamine at the scene. The test results of these rocks were negative for narcotics. No report states that the officers also expected to find cocaine or found what they believed to be cocaine. None of the testimony at trial mentions this, nor are the six white rocks mentioned.

The contract would have given trial counsel evidence that a "relaxed" attitude had been taken in the planning and carrying out of the bust "operation." By being able to point out that the police officers involved had taken the risk of exposing the identity, and therefore the safety, of one confidential informant rather than procuring a blank form for Harmon to sign, the jury would have been able to make the logical inference that the officers involved would have been lax about other measures. This would have supported the defensive theories, which have now been confirmed by testimony at the evidentiary hearing, that the officers involved were not wearing clothing identifying them as law enforcement or other visible insignia identifying them as such.

The confidential informant contract and receipt and Harmon's truthful testimony, as now known through his statements to writ counsel's investigator, contradict Sergeant Womack's testimony regarding Applicant's arrest and his deal with Harmon. The mere existence of the informant contract itself contradicts Womack's testimony and would have been used to impeach his testimony. The contingency deal made with Harmon, in which he was directed to specifically target Applicant and in which the amount of his compensation would increase with the narcotics seized, as well as his pending criminal case being dismissed would have impeached, disputed, and contradicted Harmon's trial testimony.

4. *Evidence that crime scene investigator McAnarney made false statements in her reports in other, unrelated cases would not have been relevant or admissible in the trial of this case.*

5. *The applicant was not deprived of any material information regarding McAnarney's participation in this case or the termination of her employment because of her misconduct in other cases.*

Applicant objects to items 4 and 5 of the Conclusions of Law together. As stated above, the defense was informed that McAnarney handled narcotics evidence at some point during the collection of evidence and that she had logged them into evidence, but that other technicians would be available to testify as to the collection of evidence. Testimony at trial, as shown above, was that Deputy Kellum physically collected the evidence brought to trial under Womack's

supervision as Womack was in charge of the overall operation. The State did not disclose that the narcotic evidence that McAnarney handled was not the evidence brought to trial, but six white rocks. As Mr. Tritico testified in the evidentiary hearing, the defense was not apprised of this, nor and report documenting such.

McAnarney's actual involvement, and the depth of her involvement in collecting evidence at the scene, was not disclosed to the defense either. The defense was not told, as described above, that McAnarney had collected essentially all of the physical evidence at the scene. Also, as shown above, it was not disclosed to the defense whether any of the instances in which McAnarney's integrity had been challenged involved this case. It was only disclosed to the defense that McAnarney was no longer with the Sheriff's Department due to general incompetence and forging lab results. It was not disclosed that a decision had been made to fire her for jeopardizing criminal cases, not being factual and honest in written and oral correspondence, and not accurately processing and documenting evidentiary items submitted to the crime lab and that McAnarney had been allowed to resign in lieu of being terminated. *See* DX8. Nor was it disclosed that an Assistant District Attorney with the Montgomery County District Attorney's Office had filed a complaint with DPS, McAnarney's former employer, that McAnarney had made false statements in incident reports.

Mr. Tritico stated that had he been apprised of these facts, he would not have

agreed to not challenge the chain of custody of the narcotics evidence used at trial[5].

Trial defense counsel had agreed to not challenge the chain of custody of the narcotics evidence in return for the State not revealing that the defense had had the bags of powdered narcotics tested, which showed them to contain methamphetamine. As such, defense counsel was chilled from pressing into the origin of the powdered narcotics, when and where they had been collected, when they had been logged into evidence, and how they had been handled.

Had the State been required to prove chain of custody, it presumably would have been revealed that the evidence collected by McAnarney at the scene was not powdered narcotics and that the powdered narcotics had not been logged into evidence by Womack until a month after the arrests. This would have called the evidence used against Applicant into direct question. This is especially true since the drug evidence, the powdered narcotic evidence offered at trial, has changed in composition, weight and character since Anderson's trial. And since the evidence at the scene was collected by McAnarney, the favorable information that was suppressed regarding her integrity would have been even more important at trial.

The information withheld from the defense about McAnarney's departure from the Sheriff's Department, the breadth of her actual involvement in the case,

---

[5] This agreement now seems disingenuous as it was not disclosed to the defense that the narcotics evidence that McAnarney had collected and logged was not the evidence brought to trial but six white rocks that had tested negative for narcotics.

and the evidence that she collected at the scene would have disputed testimony at trial as to what evidence was collected from the scene of the incident. This information being disclosed would have also caused the State to have to prove chain of custody for the narcotics evidence produced at trial and therefore when it was logged into evidence, which would have disputed its origin, collection, and handling, exculpating Applicant.

6. *The State of Texas did not withhold from the defense any exculpatory information, prior to or during the trial of this case.*

7. *The State of Texas did not withhold from the defense any information that was material to the outcome of the trial.*

8. *The applicant was not deprived of due process or due course of law as the result of the State's failure to disclose to the defense any material information or evidence.*

In accordance with constitutional due process, the State has an affirmative duty to disclose evidence that is favorable to the accused and material to either guilt or punishment. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000) (citing *Brady*, 373 U.S. at 87 (1963)). The State's obligation to disclose *Brady* evidence and a court's duty to enforce this disclosure surpasses statutory discovery procedures. Such a duty implicates fundamental constitutional rights, since the "[d]enial of access to information which would have a reasonable probability of affecting the outcome of a defendant's trial abridges a defendant's due process rights and undermines the

court's duty to vindicate Sixth Amendment rights." *Thomas v. State*, 837 S.W.2d 106, 113 (Tex. Crim. App. 1992).

This duty is ongoing, and is irrespective of the good or bad-faith of the prosecution. *Brady*, 373 U.S. at 87. The scope of the rule in *Brady* includes evidence tending to impeach the State's witness. *See U.S. v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. U.S.*, 405 U.S. 150, 154 (1972). Under *Brady*, and its progeny, a proceeding is rendered fundamentally unfair if: (1) the prosecution suppressed favorable evidence, including impeachment evidence; and (2) the evidence was material to either the guilt or punishment of the defendant. *See Brady*, 373 U.S. at 87; *see also Kyles v. Whitley*, 514 U.S. 419, 432 (1995), *Bagley*, 472 U.S. at 683, *Blackmon v. Scott*, 22 F.3d 560, 564 (5th Cir. 1994), *Ex Parte Adams*, 768 S.W.2d 281, 290 (Tex. Crim. App. 1989).

"Favorable evidence is that which, if disclosed and used effectively, '*may* make the difference between conviction and acquittal.'" *Pena v State*, 353 S.W.3d 797, 811 (Tex.Crim.App. 2011), citing *United States v. Bagley*, 473 U.S. at 676. "Favorable evidence includes exculpatory evidence as well as impeachment evidence." *Pena v. State*, 353 S.W.3d at 811. "Exculpatory evidence is that which may justify, excuse, or clear the defendant from alleged guilt, and impeachment evidence is that which disputes, disparages, denies, or contradicts other evidence." *Id* at 811-12. Even if an individual prosecutor is not personally aware of the

favorable or exculpatory evidence, the State is not relieved of its duty to disclose as "the State" includes, "in addition to the prosecutor, other lawyers and employees in his office and members of law enforcement connected to the investigation and prosecution of the case." *Id.* at 810. Favorable evidence withheld by law enforcement from both the defense and prosecutor still violates a defendant's right to due process. *See Ex parte Mitchell*, 853 S.W.2d 1, 4-5 (Tex.Crim.App. 1993), *pet. cert. denied Texas v. Mitchell*, 510 U.S. 864 (1993).

The State was aware of the February 11, 2008 statements of Paras and Brummet. The statements were taken by law enforcement officers at the scene of the offense on Conroe Police Department forms, and a member of the Conroe Police Department participated, as a member of the Montgomery County Special Investigations Unit, in the arrests of Applicant and codefendant. The State, as it includes law enforcement involved in the case, was also been aware that the officers had not been wearing clothing or insignia identifying them as law enforcement officers. Furthermore, the State asserts that these statements are currently in their consolidated file for Applicant and codefendant's cases. These statements should have been disclosed to the defense and regardless of when the prosecution came into possession of them, there is a continuing duty to disclose.

The State was likewise aware of the information behind Caryn McAnarney's investigation and departure from the Sheriff's Department, as well as the prior

complaint regarding her integrity filed by the prosecutor's office. The State would have also been aware of her actual involvement and reports in Applicant's case, and therefore the nature of the alleged narcotics evidence she collected, as McAnarney was an employee of one of the investigating agencies. Information regarding when the narcotics evidence produced at trial and Timothy Sherber's favorable interview and subsequent request for a deal was also known to the State as they involved law enforcement officers involved in and investigating Applicant's case.

The State was also aware of Harmon's contingency contract and the threats preventing his truthful testimony as the law enforcement agencies and/or members of the prosecutor's office were involved. And as it was the same District Attorney's Office that dismissed the charges against Harmon as prosecuted Applicant, that information should have been disclosed to Applicant.

WHEREFORE, PREMISES CONSIDERED, Rodney Anderson respectfully prays that he be granted any and all relief under law and equity to which he is entitled as the due process rights of an innocent man were violated.

Respectfully Submitted,

CYNTHIA E. ORR
Bar No. 15313350
GOLDSTEIN, GOLDSTEIN & HILLEY
310 S. St. Mary's St.
29th Fl. Tower Life Bldg.
San Antonio, Texas 78205

whitecollarlaw@gmail.com
210-226-1463 phone
210-226-8367 facsimile

CHRISTOPHER M. GRIFFITH
Bar No. 24069072
LAW OFFICE OF CHRISTOPHER M
GRIFFITH
310 S. St. Mary's St., Ste. 1215
San Antonio, Texas 78205
cmarkgriffith@gmail.com
210-229-1444 phone
210-229-1445 facsimile


By:___/s/ Christopher M. Griffith_____
     CHRISTOPHER M. GRIFFITH

Attorneys for Applicant,
RODNEY ANDERSON


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above foregoing Objections to the Findings of Fact and Conclusions of Law has been delivered *via* electronic filing to Assistant District Attorney Bill Delmore, as a member of eFileTexas.gov filing system, and *via* e-mail, on this the 12th day of October, 2015.

By:___/s/ Christopher M. Griffith_____
CHRISTOPHER M. GRIFFITH